472 So.2d 573 (1985)
Billie J. Argus, Wife of/and Herbert ARGUS
v.
William C. SCHEPPEGRELL, Jr., M.D.
No. 85-C-0100.
Supreme Court of Louisiana.
June 28, 1985.
Rehearing Denied September 9, 1985.
Douglas A. Kewley, Bruce A. North, Malony, Nolan, North & Reiss, Metairie, *574 William J. Scheffler, III, Gretna, for plaintiff-applicant.
Dominic J. Gianna, John D. Person, Hammett, Leake & Hammett, New Orleans, for defendant-respondent.
LEMMON, Justice.
We granted certiorari in this pre-comparative fault case to determine whether a physician who wrongfully supplied prescriptions for controlled dangerous substances in excessive amounts to a teenaged patient who was a known drug addict, even after promising the patient's mother that he would not supply the patient any more prescriptions for drugs, should be relieved of liability for the patient's death on the basis that the patient was contributorily negligent by taking a lethal overdose of drugs. We hold that because of the disparity of positions in the relationship between a trained and licensed physician and a nineteen-year old uneducated patient whose drug addiction was known to the physician, and because of the vastly different duty required of each party under the circumstances, the patient's reasonably expected conduct did not constitute an absolute bar to her parents recovery for her wrongful death. The patient's conduct cannot be, at the same time, both the foreseen risk which imposes the duty on the physician and the defense which totally excuses the physician's breach of that very duty. Under such circumstances, the physician can only avoid liability completely (even in a pre-comparative fault case) by refusing to supply prescriptions at all.[1]
Plaintiffs' daughter, Cindy Argus, consulted Dr. William Scheppegrell in December, 1975. She was a few months beyond her eighteenth birthday, and he had been in private practice for nineteen years. In January, 1976, Cindy requested diet medication as a method of controlling her weight while pursuing a modeling career. Although Cindy was five feet, six inches tall and weighed only ninety-seven pounds, Dr. Scheppegrell prescribed forty preludin tablets in 75-milligram dosage and forty tuinol tablets in 200-milligram dosage. Dr. Scheppegrell continued to supply prescriptions for these and other drugs at close intervals over a period of nineteen months.
In early August, 1977, Cindy's mother called Dr. Scheppegrell and told him that Cindy was addicted to drugs and might be suicidal. She obtained his promise not to furnish the child with any further prescriptions. Nevertheless, on August 15, 1977, Dr. Scheppegrell gave Cindy a prescription for fifty tablets each of preludin and tuinol, along with valium. Two days later, she took three-fourths of the bottle of tuinol and became comatose. She died one month later from the overdose.
A medical review panel determined that Dr. Scheppegrell failed to comply with the appropriate standard of care in that he prescribed drugs over a prolonged period of time when he knew or should have known the drugs would cause addiction and also prescribed the drugs in quantities that were deleterious to human life and health. After a trial on the merits, the jury found that both Cindy and Dr. Scheppegrell were negligent, and the district court rendered a judgment in favor of defendant. The court of appeal affirmed. 459 So.2d 238. We granted certiorari to review the decision of the lower courts. 464 So.2d 304.
The disparity in the positions between the doctor and this particular patient could not have been greater. Cindy was one of seven children. Her father at one time held two jobs, and he and Mrs. Argus assisted in managing the apartment complex where they lived.
Cindy was far from a model child. Her mother caught her smoking marijuana when she was fourteen years old. She dropped out of school in the ninth grade at age 16. Although it is not clear when her drug addiction started, and although the defense attempted to show that she and *575 her friends obtained prescriptions from several doctors for the purpose of selling drugs to satisfy their own addiction, the record plainly established that the amount and combination of drugs prescribed by Dr. Scheppegrell alone could have caused addiction.
Both preludin and tuinol are controlled dangerous substances under federal and state law. An expert in medicine and pharmacology testified that there was no valid medical reason for prescribing the two drugs in combination with each other. Preludin is an amphetamine which may be used as an appetite suppressant.[2] Preludin can create a psychological craving for euphoria which leaves its victim in a depressed, confused and anxious state when the use of the drug ceases. Tuinol is a combination of barbiturates which may be used to treat insomnia. Tuinol can create a psychological and physical addiction, rendering its victim physically ill and suspectible to seizure and other serious physiological symptoms when the drug is discontinued. Ingestion of eight to fifteen pills can be fatal.
The combination of drugs in the present case created a cycle which ultimately resulted in Cindy's death.[3] As the psychological craving for amphetamines increases, the victim needs more and more of the drug to induce euphoria because of the system's increased tolerance. At the same time, as the physical craving for barbiturates increases, the victim needs higher and higher dosages to induce sleep, but does not build up a tolerance to the drug's potential lethal effects.
Over the course of nineteen months, Dr. Scheppegrell prescribed this combination of drugs at least seventeen times. Of the seventeen prescriptions, the doctor recorded only four on the patient's chart, a failure he attributed to oversight. Although the instructions on the preludin prescription were to take one pill (of the forty pills) daily in the morning, the doctor issued new prescriptions several times within fourteen days. He once prescribed two full bottles of preludin on the same day, putting the second one in the mother's name. Although the doctor several times noted that no refills were to be given, he consistently provided new prescriptions.
On October 1, 1976, Cindy was picked up by the police and treated at the hospital for a possible overdose of barbiturates. Mrs. Argus frequently found pills in Cindy's purse and noticed "track marks" on her arms about six months before the fatal overdose. The autopsy report also listed numerous scars, the size, shape and number of which indicated, according to medical testimony, that Cindy may have been self-injecting preludin for some time prior to her death. Nevertheless, Dr. Scheppegrell testified that Cindy appeared happy and well-adjusted and displayed no evidence of drug addiction. He denied seeing any "track marks", although he claimed that he checked her blood pressure on every visit.
Approximately two weeks before the fatal overdose, Mrs. Argus called Dr. Scheppegrell about refraining from providing further prescriptions. The substance of that conversation is contested. Mrs. Argus testified that she told the doctor that Cindy was having seizures and asked if they could be caused by the drugs he had prescribed. When the doctor answered affirmatively, she asked him to stop the prescriptions, and he agreed. Dr. Scheppegrell, in a television news interview following the overdose, admitted that the mother had called and that he had agreed to discontinue the prescriptions. He stated, however, that the mother only told him *576 that Cindy was an addict and that she might be suicidal.
Under either version of the conversation, it is evident that Dr. Scheppegrell knew Cindy was seriously addicted to the prescribed drugs and was in danger of seizures or other adverse physical reactions, as well as of accidental or voluntary overdoses which could be fatal. Yet, despite promising to stop prescribing the drugs, he proceeded to prescribe both drugs again on August 15, 1977 and increased the amount to fifty tablets of each, while also prescribing valium. When the pharmacist called the same day to check on the prescription, Dr. Scheppegrell verified that he had issued it.[4]
On the day of the overdose, Cindy returned home about 1:30 p.m. Her mother sent her to bed, noting that she was very depressed and appeared "loaded on pills". When Cindy awoke, she bathed and then called a friend who came over to the apartment. The friend searched Cindy's purse at Mrs. Argus' request and gave the bottles of tuinol and preludin to Mrs. Argus, who eventually hid them in a dresser drawer with her own medication. Thirty minutes later, the friend returned with Cindy and told Mrs. Argus that her daughter was too loaded to stay out. Mrs. Argus put Cindy back to bed and told her eleven-year old daughter to watch her while she was downstairs at a meeting with the manager of the apartment complex. About an hour later, the daughter reported that Cindy was awake, and shortly thereafter the daughter returned with information that Cindy had taken an entire bottle of pills. When Mrs. Argus could not revive Cindy, she called Dr. Scheppegrell who denied that he had ordered the last prescription, but advised her to get Cindy to an emergency room. Cindy was comotose upon arrival at the hospital and remained in a coma until her death.
Defense counsel admits that he has no defense for the doctor's misconduct.[5] The doctor's actions were indeed indefensible. Because of the public's respect for and confidence in someone who is licensed to practice medicine, there is a correspondingly heavy responsibility on physicians not to deliberately violate the standards of integrity demanded by that license. In this case, the doctor supplied an uneducated teenaged patient with prescriptions for controlled dangerous substances, in greatly excessive quantities and in combinations known to be dangerous, over a period of nineteen months. He furnished the last prescription at a time when he knew the patient was addicted to the drugs previously prescribed, when he knew the patient was in a seriously weakened and depressed physical and mental state, when the patient's mother had expressly requested that he not supply any further prescriptions, and when he had promised the mother not to do so.
The court of appeal observed that there could hardly be a more blatant disregard for duty by a doctor toward his patient, but ruled that the doctor's duty did not extend to protecting the patient against the deliberate (as opposed to the accidental) taking of an overdose of pills.[6] It is in this analysis of comparative duties and risks that we primarily disagree with the court of appeal.
*577 The duty in this type of situation was succinctly analyzed by the court in Outlaw v. Bituminous Ins. Co., 357 So.2d 1350 (La.App. 4th Cir.1978), cert. denied 359 So.2d 1293. In that case, a mature golfer, aware that a nine-year old boy was crouching behind a golf bag (172 feet away and slightly to the golfer's left) in order to allow the golfer to play through, nevertheless drove the ball which struck the boy in the eye as he raised his head above the bag. The court held that the golfer breached his duty by driving the ball at all under the circumstances. (In other words, the golfer could only fulfill his duty by not driving at all.) The court further held that any contributory negligence by the boy was not an absolute bar to his recovery, reasoning:
"[The boy's] negligence cannot be both the foreseen risk which imposes the duty on the mature golfer not to hit the ball and at the same time a defense to an action for damages for breach of the mature golfer's duty. The youngster's leaving a place of safety cannot both impose a duty and excuse its breach." 357 So.2d at 1353.
The court's reasoning was obviously based on the comparison of the duties of the two parties arising from the disparity of their relative positions and of the risk of harm created as a consequence of the breach of duty. Compare Baumgartner v. State Farm Mutual Auto. Ins. Co., 356 So.2d 400 (La.1978). Furthermore, when the rule of law which gave rise to a duty was specifically designed to protect the victim against the risk of his own negligence, recovery should not be absolutely barred for the injury or death which the rule of law was designed to prevent. Compare Boyer v. Johnson, 360 So.2d 1164 (La. 1978).
Here, Dr. Scheppegrell could only fulfill his duty to his patient by not giving her further prescriptions for drugs. When his giving her prescriptions for additional drugs in increased amounts caused her death, her parents are entitled to recover for the wrongful death which the rule that gave rise to that duty was designed to prevent.
Finally, defendant contends that plaintiffs' recovery should be barred by their own negligence. A parent is required only to use reasonable precautions with regard to a child under his supervision, as judged by commonsense standards for a reasonably prudent person under similar conditions and circumstances. Smolinski v. Taulli, 276 So.2d 286 (La. 1973). Here, Mrs. Argus realized her nineteen-year old child was high on drugs and sent her to bed. After Cindy went out again, Mrs. Argus put out of sight the pills removed from Cindy's purse. When Cindy returned in the same condition, Mrs. Argus again sent her to bed and instructed her younger daughter to watch over her while she attended a meeting in the same building.[7] We cannot say that Mrs. Argus breached her duty to her child by failing to take further precautions or that her conduct was a legal cause of her child's death.
Accordingly, the judgment of the lower courts is reversed, and it is ordered that judgment be rendered in favor of plaintiff. The case is remanded to the court of appeal to fix the damages on the basis of the record.
MARCUS, J., dissents and assigns reasons.
DENNIS, J., dissents in part and concurs in part. The mother's negligence should bar her recovery.
MARCUS, Justice (dissenting).
Clearly, Dr. Scheppegrell's conduct was reprehensible. However, I am unable to say that the jury was clearly wrong and the court of appeal erred in finding Cindy negligent resulting in the denial of plaintiffs' *578 claims. Accordingly, I respectfully dissent.
NOTES
[1] Of course, the legislative adoption of comparative fault after the incident that gave rise to this litigation may require a reexamination of this reasoning. See Turner v. New Orleans Public Service, Inc., 471 So.2d 709 (La.1985).
[2] The 1975 Physician's Desk Reference states that the evidence is weak that preludin is any more effective in weight control than diet alone and warns that the substance may cause psychological habituation and dependancy. Medical testimony established that preludin should be prescribed only on a highly restricted basis.
[3] Mrs. Argus testified that Cindy would often go on an "eight day high" after an appointment with Dr. Scheppegrell. She would use preludin to keep her "up", and when she came down, she would use the barbiturates prescribed by Dr. Scheppegrell "to sleep it off.
[4] In the television interview, the doctor denied ordering the last prescriptions.
[5] In fact, the doctor went to prison for similar misconduct in relation to prescribing drugs, as shown by the record. The court of appeal noted that the testimony of the doctor offered in excuse for his conduct was "not just incredible", but was "ridiculous".
[6] The medical expert testified that use of tuinal can alter consciousness so that the user cannot judge how much he had taken, but that it was impossible to determine from the medical records whether the overdose was an accident or a suicide. To the extent that the defense depended upon proof of suicide, it was defendant's burden of proof, and since either was equally probable, the evidence did not preponderate in favor of a finding of suicide.

Because the court of appeal postulated its legal conclusion on a deliberate overdose and the evidence does not support the factual finding underlying that conclusion, the decision is subject to reversal on that basis.
[7] Mrs. Argus had previously arranged for Cindy to enroll in substance abuse programs, but Cindy failed to keep scheduled appointments.