546 So.2d 197 (1989)
Mrs. Helen Dunn BOURNE
v.
SEVENTH WARD GENERAL HOSPITAL, et al. (Two Cases)
Nos. 88 CA 0502, 88 CA 0503.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
Rehearing Denied June 23, 1989.
*198 Joseph Simpson, Atty., Amite, and Paul Due, Atty., Baton Rouge, for plaintiff-appellee.
Daniel A. Reed, Baton Rouge, for Seventh Ward Gen. Hosp.
Tom H. Matheny, Atty., Hammond, for State of La., Dept. of Health and Human Resources.
Gary M. Cooper, Baton Rouge, for Sherman A. Bernard.
Philip O. Bergeron, Atty., New Orleans, for M.L.G. Winkler, M.D.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
Three Louisiana health care providers appeal an adverse judgment totalling $201,838.55 for the pain and suffering and wrongful death of a 20-year-old woman.
The decedent, Kathy D. Harper, was the daughter of Mrs. Helen Dunn Bourne, appellee. On February 17, 1978, the daughter attempted suicide by swallowing the contents of two bottles of prescription pain pills. However, she did not die until February 21, 1978. The mother brought a medical malpractice action against several health care providers that treated her daughter during the interval.
A long and complicated legal contest culminated in a trial on the merits nine years after the death. The trial court decided in favor of the plaintiff and awarded judgment *199 against Dr. M.L.G. Winkler, Seventh Ward General Hospital, and the State D.H. H.R. through Southeast Louisiana State Hospital.[1]
The death on February 21, 1978, was preceded by the following unfortunate chain of events.
February 10: Ms. Harper was in an automobile accident in Houston, Texas, in which she suffered a painful cervical strain. She returned to her mother's home in Natalbany, Louisiana.
February 14: Ms. Harper consulted Dr. Larry Fambrough, who prescribed two drugs for relief of pain, Flexeril and Darvocet-N 100.
February 17: Between midnight and 1:00 a.m., Ms. Harper attempted suicide by swallowing the remaining pills of the two prescriptions. She left a suicide note with the time of 12:15.
February 17: Shortly before noon she was taken by her mother to the emergency room at Seventh Ward General Hospital. She was seen by Dr. Fambrough, who ordered her stomach pumped out. He recommended that her case be turned over to an internal medicine specialist, the defendant Dr. Winkler.
Dr. Winkler ordered Ms. Harper's admission to the intensive care unit, where the patient received appropriate treatment.
February 18: Ms. Harper appeared to be progressing well, and she was transferred to a semi-private room. Dr. Winkler ordered laboratory testing (SMA-20) during the afternoon.
February 19: The blood sample for the SMA-20 was drawn. Because Seventh Ward General Hospital did not do that kind of laboratory work in 1978, the sample was sent by courier to a pathology laboratory in Metairie, Louisiana.
February 20: At 7:00 a.m. Dr. Winkler visited Ms. Harper and ordered a liver profile study, a test which was performed in-house at that time. The doctor's orders were for the test "now," which meant that the sample would be drawn within an hour but that the sample would not be processed by priority. The length of time between the drawing of the sample and the availability of the test results depended upon the number of tests being run in the laboratory on that particular day and at that particular time.
Dr. Richard Strobach, a psychiatrist who had been alerted to Ms. Harper's case because it was an attempted suicide, also visited Ms. Harper during the morning hours. However, he did not interview her because of her apparent sleepiness.
Around noon, Ms. Harper began exhibiting bizarre, violent behavior. Dr. Winkler was called, and she ordered the patient restrained. Ms. Harper was restrained with bed linens, the only device available for such a procedure since Seventh Ward did not have facilities to handle psychiatric patients. Dr. Winkler summoned Dr. Strobach for the purpose of getting his order to transfer the patient.
Mid-afternoon, Ms. Harper was transferred by ambulance to Southeast Louisiana State Hospital, a psychiatric unit. At the time of the transfer Dr. Winkler had not yet received the results of the two sets of tests she had ordered; nevertheless she assured Dr. Strobach that the patient was medically stable. Neither doctor sent the patient's records with her, each assuming that the other was going to do so.
At Southeast Louisiana State Hospital, the admitting physician was Dr. Alfred Hott, now deceased. Dr. Thomas C. Roach, an internist and psychiatrist employed by the state facility, was present in admissions at that time. He ordered that the patient be taken directly to the ward, but he did not suggest that the medical work-up normally performed before a patient is admitted be bypassed. The patient's *200 record shows that her skin was "icteric" (jaundiced) at the time of admission.
February 21: From 6:00 a.m. until 6:30 p.m., the patient was kept in full restraints, despite her vomiting and soiling her bed with urine and excretions; her temperature varied from 100.2° to 104.6°.
During the late afternoon, Ms. Harper vomited and aspirated. Resusitation measures were started at 6:00 p.m., but the patient was pronounced dead at 6:30 p.m.
The protocol of an autopsy performed 24 hours later by Dr. Friedricks H. Harris listed as the cause of death: "acute necrotizing toxic hepatitis with jaundice probably secondary to overdose of Flexeril and Darvocet deliberately ingested by the patient with suicidal intent."
The thrust of Mrs. Bourne's claim was that the defendants deprived her daughter of a reasonable chance of surviving the overdose. The plaintiff introduced proof that the substandard care which the decedent received at the hands of Dr. Winkler caused her daughter to exhibit violent behavior at Seventh Ward General Hospital, which in turn resulted in her being transferred to a psychiatric facility instead of a medical facility with a psychiatric unit.
Accepting plaintiff's version of the medical incidents, the trial court noted its favorable impression of the testimony of plaintiff's expert, Dr. Jay Shames. In that doctor's opinion, in 1978 an internist such as Dr. Winkler should have known the potential of liver toxicity from the drugs Ms. Harper had swallowed. He stated that Dr. Winkler should have watched carefully for the possibility of the patient's developing hepatitis, and the patient should have been supported properly through that illness. The patient should have been given intravenous fluids, instead of a regular diet, to "rest" the liver.
Dr. Shames also faulted Dr. Winkler for not having detected that the patient was hypoglycemic. He cited hypoglycemia as the probable cause of the bizarre behavior of the patient immediately before and after her transfer to Southeast Louisiana State Hospital.
The trial judge reached the following conclusions concerning the various defendants:
Dr. Winkler breached the standard of care owed by her as an internal medicine specialist in assuring Dr. Strobach that the patient was medically stable, as a result of which Dr. Strobach, with the concurrence of Dr. Winkler, made arrangements to get the patient transferred from a medical facility to a psychiatric hospital.... Dr. Winkler was negligent in not ascertaining the critical tests results.
. . .
Seventh Ward was similarly negligent in not having in effect procedure and practice whereby abnormal tests result (sic) such as the low blood sugar and the bilirubin and liver enzymes would be reported immediately by telephone or otherwise to the physician such as Dr. Winkler.
. . . .
Southeast Louisiana Hospital was not justified in blindly relying on the physician's emergency certificate because it, too, had an established procedure whereby before a patient was accepted for admission, the patient needed to be examined to determine that the patient was not physically sick.... Southeast ordered no pertinent laboratory tests ... nor did it make any attempt to follow up with Seventh Ward General Hospital concerning any laboratory tests which had been performed at Seventh Ward. Instead the patient was kept in full restraints....
After taking all the expert testimony into account, the trial judge concluded that Dr. Winkler's negligence was established by a preponderance of the evidence. Furthermore, the judge stated that Seventh Ward's negligence was "a contributing cause of the unnecessary suffering ... and her ultimate unnecessary and thus wrongful death." Likewise, the court concluded that Southeast Louisiana Hospital's negligence was "a contributing cause" of the suffering and wrongful death.
*201 Among themselves, the three defendants on appeal assign 20 errors, many of which are duplicative. We shall examine those assignments which deal with the elements of the medical malpractice claim, such as negligence, prior to addressing those assignments which deal with subordinate issues, such as the release of co-obligors.
Our analysis of a medical malpractice-wrongful death action requires a two-step review to determine if the trial court committed manifest error. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). First, we must determine whether the trial court erred in finding a breach of duty on the part of each defendant. Next, we must address causation. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).

BREACH OF DUTY
Dr. Winkler:
Appellant urges, as a threshold issue, that the trial court erred in qualifying the plaintiff's experts, who were not from the Seventh Ward community, to testify about her failure to ascertain the test results before the patient's transfer pursuant to Dr. Strobach's orders.
We do not see any merit in the argument that Dr. Winkler is protected by the "locality rule" for non-specialists stated in LSA-R.S. 9:2794(A)(1) as follows:
[W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the bruden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
Appellant argues that her alleged negligence in allowing the patient to be transferred before reading the test results was not an allegation which raises an issue peculiar to the specialty of internal medicine. But Dr. Fambrough, who first saw Ms. Harper in the emergency room, recommended Dr. Winkler because she was an internal medicine specialist. Whatever acts she performed in her management of the case thereafter were performed under the guise of her holding herself out in that specialty. Consequently, Dr. Winkler must answer to the national standard of care. See Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331 (La.1978).
One of the highly disputed issues in this case was whether Dr. Winkler knew or should have known in February 1978 that the acetaminophen contained in the Darvocet-N 100 taken in overdose causes liver toxicity. Citing several inconsistencies in Dr. Winkler's testimony, the trial judge stated that he did not find Dr. Winkler's testimony credible. Instead, as previously mentioned, the trial judge believed Dr. Shames. The trial court concluded that Dr. Winkler did know of the danger, and that she "breached the standard of care owed by her as an internal medicine specialist." This is consistent with the statute, LSA-R.S. 9:2794(A)(2), requiring proof of failure "to use reasonable care and diligence, along with ... best judgment...."
Having reviewed the record on the availability of information concerning acetaminophen in 1978, we cannot find that the trial court clearly erred in holding Dr. Winkler accountable for this knowledge. We must give the proper deference to the trial court's assessment of credibility.
Nor was it erroneous to find that Dr. Winkler's failure to use that knowledge (actual or constructive) was unreasonable. The ease with which the test results could have been obtained, such as by a phone call, makes the transfer of the patient without the test results a breach of the duty of proper care Dr. Winkler owed to Ms. Harper.
Accordingly, we affirm the trial court's finding of breach of duty on the part of Dr. Winkler.
Seventh Ward General Hospital:
The trial court found a breach of duty on the part of Seventh Ward General Hospital because the hospital did not have in effect during February 1978 a system for immediately reporting test results to the attending physician when the test results showed abnormalities in the patient.
*202 Appellant argues that this conclusion is wrong because the plaintiff failed to meet her burden of proof of negligence on the part of Seventh Ward General Hospital. We agree.
Regardless of the applicability of the "locality rule" to a hospital,[2] the measure of skill, care, and diligence each hospital employee owed the patient must be established. Matranga v. Sara Mayo Hosp., 463 So.2d 632 (La.App. 4th Cir.1984), writ denied 467 So.2d 540 (La.1985).
In the instant case, there is no evidence of delay in the performance of the liver profile study ordered by Dr. Winkler on the morning of February 20. Furthermore, the hospital had a procedure, which was known to Dr. Winkler, for having tests performed immediately. She could have ordered the test "stat," which would have signaled the laboratory to give the test priority. Seventh Ward General Hospital cannot be faulted for the doctor's failure to so order the tests.
Nor can Seventh Ward General Hospital be faulted for not sending the test results on to Southeast Louisiana State Hospital. Dr. Winkler admitted that the transfer is not the hospital's responsibility.
Similarly, Dr. Winkler knew that the SMA-20 could not be performed locally. She knew that this study, when requested on a routine basis, could take from 24 to 48 hours to be returned. Additionally, Dr. Shames indicated that the use of an outside laboratory for some studies is a common practice among hospitals.
Accordingly, we find no support in the record for the trial court's finding of substandard care on the part of Seventh Ward General Hospital. The trial judge was clearly wrong in this respect, and we must reverse the judgment against this particular defendant.
Southeast Louisiana State Hospital:
This appellant discusses the issue of substandard care, but relies almost entirely on the proposition that Southeast Louisiana State Hospital, a psychiatric hospital, did not deprive Ms. Harper of a chance of survival. Accordingly, we reserve our discussion of this particular defendant for the portion of our opinion dealing with causation.

CAUSATION
All three appellants urge that the trial court erred in finding that the suffering and death of the plaintiff's daughter were caused by their actions. The latest pronouncement on causation by the Louisiana Supreme Court is found in the case of Hastings v. Baton Rouge Gen. Hosp., supra. We are instructed that, in a death case, once a breach of duty constituting malpractice is established, the question becomes whether the malpractice lessened the patient's chance of survival. And that question is one of fact. If the action or inaction of the health care provider destroyed any substantial possibility of the patient's survival, the trier of fact is warranted in finding that the health care provider's conduct was a proximate cause of the patient's death. It is immaterial that there was another cause in fact of the death, such as the stab wounds in Hastings; there can be more than one cause in fact.
Our review of the record assures us that the trial court was not clearly wrong in finding causation. It is true that in order to find causation the trial judge had to accept the plaintiff's experts' opinions of the young woman's chances of survival. As previously noted, the trial court was impressed with the testimony of Dr. Shames. His testimony, concurred in by Dr. Don Bowers, was that the mortality rate for persons with liver damage as severe as that found at autopsy in this case did not exceed 20%. Dr. Shames relied upon medical research involving patients with overdoses who survived and had liver biopsies taken to prove the reversibility of the liver damage. From a clinical standpoint, Dr. Shames confirmed that he had *203 successfully treated many patients with bilirubin and liver enzyme test results worse than those shown for Ms. Harper in the test results which were not read until after Ms. Harper's death. Put another way, the lack of the test results showing Ms. Harper's abnormal conditions caused the omission of treatment both at Seventh Ward General Hospital and Southeast Louisiana State Hospital, which omission destroyed at least an 80% chance of survival of the liver damage.
Appellant Southeast Louisiana State Hospital argues that by the time Ms. Harper was transferred, it was too late to save her. Although this argument is closely related to everything we have said thus far about causation and survival rate, it deserves special mention.
Ms. Harper was transferred some 84 to 90 hours after the overdose. The testimony of plaintiff's experts clearly establishes, and this appellant admits, that there is a latent period from three to four days after the overdose before the liver damage begins to manifest itself. Thus, Ms. Harper was transferred during the last part of the fourth day. The symptoms she was exhibiting at that time coincide with the statistical data.
Once plaintiff proved that her daughter had an 80% chance of survival, the burden shifted to the defendant Southeast Louisiana State Hospital to prove that the chance of survival ended at a particular time prior to its treatment of the decedent. The record is devoid of proof of this nature.
Additionally, we find no error in the trial court's determination that the treatment Ms. Harper received at Southeast Louisiana State Hospital was substandard. Ms. Harper was exhibiting extreme physical symptoms,[3] but the hospital did nothing to investigate and/or treat her illness.
The appellants complain that in ruling for the plaintiff on causation, the trial court erroneously ignored the physical evidence of liver damage shown by the autopsy and discredited the testimony of the defense experts that the liver damage was irreversible.
It is well established that expert testimony is to be evaluated according to the same rules applicable to other witnesses. In Tyler v. Richardson, 476 So.2d 899, 903 (La. App. 2d Cir.), writ denied, 478 So.2d 907 (La.1985), our brethern in the second circuit stated:
After weighing and evaluating the medical and lay testimony, the trial judge may accept or reject the opinion expressed by any medical expert.... The trial judge is not bound by expert testimony. He may substitute his own common sense and judgment for that of an expert witness where, in the opinion of the trier of fact, such substitution appears to be warranted by the evidence as a whole.
Thus, we believe that the trial judge in the instant case was warranted in concluding that Ms. Harper had a substantial chance of survival which was destroyed by the substandard conduct of Dr. Winkler and Southeast Louisiana State Hospital.

SUPERSEDING CAUSE
Finding no error in the conclusion of causation brings us to the next most significant argument of the appellants: that recovery is barred under the doctrine of contributory negligence because the decedent indisputably attempted suicide.
The trial court rejected this argument, finding that the negligence of the defendants was an intervening and superseding cause of the suffering and death. We agree.
It is correct that the court in Hastings, supra, referred to the stab wound as a concurrent cause of death, which would seem to negate a classification of the medical malpractice as a superseding cause. However, since the stab wound was not self-inflicted, the court did not reach the issue of comparative fault or contributory negligence.
Nor are the appellants justified in relying on the case of Argus v. Scheppegrell, 472 *204 So.2d 573 (La.1985), rev'g 459 So.2d 238 (La.App. 5th Cir.1984). In that case the defendant doctor was charged with negligently providing drugs to a known addict who subsequently took an overdose. The court of appeal noted an exception to the complete bar of contributory negligence: when the defendant had a duty to protect the plaintiff against the risk of his own carelessness. However, finding that the defendant doctor had no duty to protect the patient from a deliberate and knowing overdose of drugs, the appellate court exonerated the doctor of liability. The Louisiana Supreme Court disagreed with the appellate court's interpretation of the evidence, finding that the proof was insufficient to establish whether the decedent had deliberately or accidentally taken an overdose. Justice Lemmon stated: "Because the court of appeal postulated its legal conclusion (of contributory negligence as a bar to recovery) on a deliberate overdose and the evidence does not support the factual finding underlying that conclusion, the decision is subject to reversal on that basis." Argus, 472 So.2d at 576, n. 6.
The case is clearly distinguishable from the one sub judice. In Argus, the defendant doctor was charged with providing the patient with the drugs which were used for the overdose; the intentional or accidental act of the decedent was the act which intervened the doctor's wrong and the death. However, the decedent's act did not supersede, or take the place of, the doctor's wrong as a causative factor.
Contrarily, the intentional act of Mrs. Bourne's daughter in taking the overdose preceded the acts of the defendant medical care providers. Thus, their acts intervened the overdose and the death. Since the negligence of the defendants resulted in depriving Ms. Harper of an 80% chance of survival, that negligence supplanted the attempted suicide as a cause of death.
We note that one appellant, Seventh Ward General Hospital, argues that Mrs. Bourne was negligent and should be barred from recovery. The trial court's classification of the defendants' negligence as an intervening and superseding cause eliminates the necessity for determining whether Mrs. Bourne was negligent. We hold that the trial court correctly decided the issue of contributory negligence according to the law in effect in Louisiana in 1978.
Another defense asserted and correctly rejected by the trial court concerned the earlier motor vehicle accident in Texas. Appellants argue that they, as solidary obligors with the original tortfeasor, were released on the "release of all claims" purportedly signed by plaintiff. On this issue, we adopt the trial court's reasons as our own:
[A]ssuming plaintiff did in fact execute the release, that execution was intended to have effect solely in Texas. There was no proof submitted to demonstrate that under Texas law this purported release would have released anyone other than the named parties. Moreover, it is obvious to the Court that plaintiff never intended to release anyone other than the Texas defendants and, instead, intended to continue the prosecution of her medical malpractice claims against the Louisiana defendants. It is also obvious that such was the same intent of the other parties to the purported release. (See Plaintiff Exhibits 30 through 32.) John Caskey, the attorney who was representing plaintiff at the time, testified, consistent with the aforementioned exhibits that the entire settlement agreement was expressly conditioned upon the requirement that plaintiff agree to reimburse the Texas defendants the entire $13,000.00 paid by the Texas defendants, subject only to the requirement that fees and expenses incident to the prosecution of the claims in Louisiana first come off the top. There would have been no settlement and no payment unless Caskey signed the letter as an express written condition of the offer of settlement made by the Texas defendants.
Defense counsel cited Weber v. Charity Hospital of Louisiana, 475 So.2d 1047 (La.1985) for the proposition that there is solidary liability between defendants in an original accident and subsequent medical malpracticing defendants. The *205 Louisiana Supreme Court in Weber, however, made it clear that such solidary liability exists only where there is no entervening (sic) independent cause. There must be the requisite ease of association between the original injury and the subsequent medical malpractice so as to satisfy the duty-risk analysis. The factual situation in the instant case does not satisfy that requisite ease of association and duty-risk formulation. In this case there is interposed not only the suicidal overdose attempt by Kathy Harper but then the subsequent medical malpractice.

Weber is also significant in demonstrating that because former Louisiana Civil Code article 2203 was in derogation of the general rule of law that no one is presumed to have renounced rights against others unless it appears that such person clearly intended to do so.... Weber also points out that there is nothing sacramental about the form in which the reservation must be made, citing Cusimano v. Ferrara, 170 La. 1044, 129 So. 630 (1930). Cusimano in turn was reviewed by the Louisiana Supreme Court in Roy v. U.S.A.A. Casualty Insurance Company, 453 So.2d 564 (La.1984) wherein it was pointed out that the determination of whether or not a release of solidary debtors occurred required comparison of the two release documents which were executed by the plaintiff. In the instant case, the purported "release of all claims" is not the entire release agreement, but is only part thereof. When reviewing the other part, consisting of the written offer and the written modified acceptance by plaintiff's attorney (Plaintiff Exhibits 30 through 32) it is clear that the intent of all parties to the release was that plaintiff contemplated a release of only the Texas defendants and with reservation of her rights to continue to pursue the claim against the Louisiana medical malpractice defendants, not only for her potential benefit, but also for the benefit of the Texas defendants who were to receive potential reimbursement in full of the total $13,000.00 of settlement funds.

DAMAGES
The final major issue on appeal is quantum. The trial court awarded the sum of $50,000.00 for Ms. Harper's pain and suffering and the sum of $150,000.00 to Ms. Bourne for the wrongful death of her 20-year-old daughter. It is rudimentary that before we can disturb this award, the record must show clearly that the trial court abused its discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
We have no doubt that the record fully supports an award of $50,000.00 for the pain and suffering endured by the decedent. The medical records of Southeast Louisiana State Hospital alone graphically illustrate her plight: under full restraints she experienced vomiting (on occasion a brownish fluid from both mouth and nose); soiling her bed with dark, foul-smelling urine and a reddish-brown discharge from the rectum; mentally regressing from a violent hostility exhibited by screaming, hollering, and refusal of food and drink to a "passive" lack of response. By the time she died at 6:30 p.m., February 21, 1978, more than 24 hours after her arrival at the psychiatric facility, her temperature had risen to 104.2°.
Nor do the medical records kept at the hospital where she died reveal the mental distress Ms. Harper endured before being transferred there. But the trial record does: at Seventh Ward General Hospital during her violent behavior she was calling out for her mother and step-father to help her.
We have no reservations about affirming the award for pain and suffering.
Likewise, we have examined the record to determine whether the trial judge abused his much discretion in awarding the surviving mother the sum of $150,000.00 for the wrongful death of her daughter. We are mindful of the mandate under which we review the award: we must "determine whether or not this trier of fact has abused its discretion in the award to this particular plaintiff under the facts and *206 circumstances peculiar to this case." (Emphasis in original.) Reck v. Stevens, 373 So.2d 498, 500-501 (La.1979).
Appellants argue that the award is excessive because the decedent was a problem child. One consideration for assessing damages to a parent for the loss of a child is the extent to which the parent is dependent upon the child for emotional support. In the instant case, the child was the one who was emotionally dependent. But we cannot say that the loss to the caretaker mother was not as great as it would have been in the opposite situation. The record discloses that Mrs. Bourne appeared to have "given up" after her daughter's death. Certainly the ordeal in the hospital, albeit only of a few days duration, must have been an emotional roller-coaster: the initial shock of the intentional overdose, followed by appearances of total recovery with plans for the future being made, followed by the sudden and dramatic bizarre behavior. Finally, her daughter died, and the mother had to identify the body and authorize an autopsy.
Consequently, although a lesser award could have been justified, under the standard of review we do not find that the record supports disturbing the award of the trial court. We affirm.

INTEREST
Although we affirm the award of damages, we find that the trial court committed error in awarding interest, and we must partially amend that portion of the judgment. The judgment casts defendant Southeast Louisiana State Hospital with interest from date of judicial demand, October 26, 1978, and defendants Dr. Winkler and Seventh Ward General Hospital[4] with interest from the filing of the petition to empanel the medical review panel, September 20, 1979.
On the date of filing of the petition against Southeast Louisiana State Hospital, October 26, 1978, that state agency had no right to have the claim heard by a medical review panel. LSA-R.S. 40:1299.39.1 instituting review panels for state agencies did not become law until 1986. Consequently, there is no distinction between the claim against this defendant and any other tortfeasor. The law is clear that interest runs from date of judicial demand, and plaintiff was not required to introduce evidence on the issue.[5]
The judgment casting Dr. Winkler with interest from September 20, 1979, is another matter. Dr. Winkler was entitled to a medical review panel. When plaintiff filed suit against her without invoking a review panel, plaintiff's suit was premature and was dismissed. Consequently, the "new" date of judicial demand did not occur until March 31, 1987, when plaintiff amended her suit against Seventh Ward General Hospital to include Dr. Winkler as a defendant.
The trial court rendered judgment for interest from the date of the petition to empanel the medical review panel, September 20, 1979, on the basis of "introduction" of evidence of that date by ex parte motion the day after the trial. Clearly, it was not within the judge's discretion to admit this evidence belatedly. The judgment against Dr. Winkler will be amended to provide for interest from date of judicial demand, March 31, 1987.
One final technicality in the judgment against Dr. Winkler requires adjustment. The judgment casts her liable in solido for a total of $201,838.55. However, it is clear that a defendant physician is not personally liable for any amounts in excess of $100,000.00 in accordance with LSA-R.S. 40:1299.42 B(2). The judgment shall be *207 amended to cast Dr. Winkler in judgment for the entire amount, subject to a limit of personal liability of $100,000.00.
In summary, the judgment of the trial court against defendant Seventh Ward General Hospital is reversed and plaintiff's claim against this defendant is dismissed. The judgment against Dr. Winkler and Southeast Louisiana State Hospital is affirmed, casting them liable in solido for $201,858.55, with interest on said amount to run from March 31, 1987, against Dr. Winkler, and with the personal liability of Dr. Winkler to be limited to $100,000.00; with interest on said amount to run from October 26, 1978, against Southeast Louisiana State Hospital.
Costs of this appeal in the amount of $3,590.10 are to be assessed one third each to appellant Dr. Winkler, appellant Southeast Louisiana State Hospital, and appellee Mrs. Bourne.
REVERSED IN PART, AFFIRMED IN PART, AMENDED AND RENDERED IN PART.
NOTES
[1] Although the original petition named three additional doctors, they are not before us on appeal since judgment was silent as to them.

Because the judgment exceeded the statutory limits of recovery for medical malpractice, the Commissioner of Insurance of the State of Louisiana and the Attorney General have joined in the appeal to defend the potential claim against the Louisiana Patient's Compensation Fund.
[2] Hastings v. Baton Rouge General Hosp., supra, casts grave doubt on the applicability of the rule to a hospital. However, since the opinion does not say the rule is inapplicable in all cases, it is arguable that the holding should be limited to the facts of that case.
[3] See discussion under "Damages", infra.
[4] Since we have found that Seventh Ward General Hospital is not liable, that portion of the judgment casting it for interest automatically falls.
[5] Counsel for this appellant in his brief asserts that there is a stipulation of record that interest would not run until such time as the Medical Review Panel rendered its decision. The stipulations referred to by other parties do not mention this particular appellant. Since appellant's brief does not specify record references as required by the Uniform Rules of the Courts of Appeal, Rule 2-12.4, we decline to address this contention.