573 So.2d 1219 (1991)
Jo Ann CLAIR
v.
PARIS ROAD DRUGS, INC., Larry Renz, and Ron Meisler.
No. 90-CA-0321.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 1991.
Writ Denied April 5, 1991.
*1220 Thomas A. Gennusa, II, Metairie, for plaintiff, appellant.
Raymond A. Pelleteri, Lynn H. Frank, Ward & Clesi, New Orleans, for defendants, appellees.
Before GARRISON, LOBRANO and BECKER, JJ.
LOBRANO, Judge.
Plaintiff-appellant, Jo Ann Clair, filed suit against defendants-appellees, Paris Road Drugs, Inc. (Paris Drugs), Ron Meisler, Lawrence (Larry) Renz and their liability insurer, State Farm Insurance Company for damages resulting from her drug addiction as a result of defendants' negligence in illegally dispensing controlled dangerous substances without a doctor's prescription.

FACTS:
From July, 1981 through October, 1981 and September, 1981 through December, 1983, Clair was treated for nervousness and weight reduction by Drs. Calvin Jackson and Louis Gehbauer, respectively. On the first three of four visits that Dr. Jackson treated Clair, he prescribed various medications without refills. On the last visit, he prescribed a thirty (30) day supply of Valium without refills.
Clair was treated by Dr. Gehbauer on a monthly basis. He prescribed Doriden, Ativan and Noludar.
Paris Drugs was Clair's pharmacy. From August, 1983 until December, 1983, Kim Young was the owner and pharmacist of Paris Drugs. He filled all of Clair's prescriptions. During the latter part of 1983 Young sold Paris Drugs to Gus Renz. Gus Renz placed his cousin Larry Renz in charge of the daily operations of Paris Drugs. To fill the vacancy left by Young, Larry Renz advertised for a pharmacist. Meisler applied. During the job interview with Larry Renz, Meisler disclosed that he had previously been suspended by the Louisiana State Board of Pharmacy (the Board) for drug shortages. In spite of his background, Larry Renz hired Meisler pursuant *1221 to a recommendation by one of the Board members. He was placed in charge of Paris Drugs' pharmacy department.
Prior to his departure, Young introduced Clair to Meisler. Meisler informed Clair that whatever medication she wanted he would refill for her if she brought him the empty bottles.[1]
Clair accepted Meisler's offer. Over the next two years she became increasingly addicted until she could not function. Without the drugs she experienced severe withdrawals consisting of bladder and bowel dysfunction, vomiting and seizures. In 1985, her ten year old daughter ran away from home because of Clair's addiction. She also lost temporary custody of her son. During her last seizure she sustained bumps, bruises, lacerations of the chin and several fractured teeth. She was brought to DeLaRonde Hospital for treatment. She was subsequently transferred to Charity Hospital for drug treatment. She remained in Charity Hospital's emergency room for three days before she was conscious and sufficiently coherent to sign herself into the detoxification unit. After six days, Clair was discharged and has remained drug free.
Following trial on the merits, the jury rendered a verdict finding Clair fifty (50%) percent negligent, Meisler, thirty-five (35%) percent negligent, Paris Road Drugs, Inc., ten (10%) percent negligent and Larry Renz five (5%) percent negligent.
The jury awarded Clair $3,000.00 for past and future medical and prescription costs and $4,000.00 for past and future physical pain and suffering. No award was made for loss of past wages or future earning capacity or past and future mental anguish.
Clair appeals the judgment of the trial court asserting the following assignments of error:
1) The trial court abused its discretion in applying comparative fault principles and thus reducing Clair's award by her alleged culpability;
2) In the alternative, should this Court find that comparative fault principles are applicable, the jury was manifestly erroneous in finding Clair fifty (50%) at fault;
3) The jury was manifestly erroneous in failing to award damages for past and future mental anguish;
4) The jury was manifestly erroneous in awarding inadequate damages for past and future physical pain and suffering.
The testimony adduced at trial is as follows:

LAWRENCE W. RENZ:
Renz testified that he was primarily the bookkeeper and also the manager of Paris Drugs. He managed the daily operations of the pharmacy. Following Kim Young's departure, Renz hired Ron Meisler on or about December 15 or 16, 1983. Prior to hiring Meisler, Renz testified that he telephoned the Board to check on Meisler's status. He spoke to board member Eddie Bopp. Bopp informed him that Meisler had been on probation but that he was "clean" now and recommended that Renz give him "another chance". He stated that he did not question Meisler as to the reasons for his suspension and probation because of Bopp's recommendation. He stated if Bopp had not recommended that he hire Meisler that he would not have hired him.
Renz testified that Meisler alone was in charge of the pharmacy department. He stated that it was not his (Renz's) job to keep controls over the amount of drugs dispensed or the number of prescriptions filled. This, he stated, was the responsibility of the store owner, Gus Renz. He testified he did not know if Gus Renz kept any controls of drugs dispensed or if any internal audits had been conducted.
Renz stated that he did bill Clair for $505.82. He admitted that this was an exceptionally high bill but did not know if it included expenditures other than for prescription drugs.
He testified that Meisler left the employ of Paris Drugs after he received a letter *1222 from the Board revoking his license due to drug shortages discovered after an audit by the Board.

RONALD M. MEISLER:
Meisler testified that he was employed as chief pharmacist and assistant manager for Walgreens from 1959 until 1982. He stated that he left the employ of Walgreens after an audit by the Board resulted in more drugs dispensed then were authorized by prescription. Meisler testified that during his job interview with Renz, he disclosed that he had been suspended by the Board for drug shortages. He testified that he was well aware of the regulations regarding controlled dangerous substances and that a schedule II drug cannot be refilled without a written prescription. He stated that Clair often asked to have the drugs refilled because they were lost or accidentally thrown away. He admitted that he never believed her but still refilled the drugs because he knew she was addicted. He testified that he refilled the prescriptions every two to three days. He admitted that by doing so he was in violation of the law but felt sorry for Clair and thought he could help her. He stated that the prescription files showed that she had taken drugs before he began dispensing them to her. He stated he reduced the amounts and kinds of drugs he gave her in an attempt to help her break her addiction.

DR. CALVIN J. JACKSON:
Dr. Jackson testified that his practice was limited to obstetrics, gynecology and weight loss. He was recognized by the court as an expert in obstetrics and gynecology.
He testified he treated Clair four times from July to October of 1981 for nervousness and weight loss. On the fourth visit he prescribed a weight loss medication and Valium. Each of these was for thirty days with no refill. Dr. Jackson testified that although his name appears on refills for Clair from 1983 to 1985, he did not authorize these either orally or in writing. In addition, he stated that Clair did not disclose that she was also being treated by Dr. Gehbauer for the same problems.

DOMINICK SCIORTINO:
Mr. Sciortino was recognized as an expert in the field of pharmacology. He testified that no telephone refills are allowed for schedule II drugs such as Percodan which Meisler dispensed to Clair. Schedule III, IV and V drugs such as Valium, Doriden and Tylenol three and four, refills can be authorized over the telephone but the oral prescriptions must be checked and verified.

RICHARD POLIZZI:
Richard Polizzi, inspector for the Board, audited Paris Drugs in 1984, 1985 and 1986. The 1984 and 1985 audits included the period of time Meisler was in charge of the pharmacy department. The audit resulted in shortages in Valium and Percodan. The 1985 and 1986 audits resulted in various shortages including Tylenol four. Polizzi stated that shortages in drugs occur when drugs are dispensed without a prescription.

JO ANN CLAIR:
Clair testified, at great length, about the many tragedies in her life. She spoke about the deaths of her sister and brother and described how she fatally stabbed her abusive husband in self defense. She stated that these traumatic events greatly affected her emotional ability. As a result, she became nervous and was unable to function. In order to cope, she turned to tranquilizers, pain pills and sleeping pills. She sought treatment from Drs. Jackson and Gehbauer. She corroborated Dr. Jackson's testimony that he treated her four times, prescribing Valium only once. She stated that Dr. Gehbauer treated her over a period of two years prescribing various medications. She testified that prior to Meisler's employment, Kim Young dispensed all of her medications. She admitted, however, that Young, unlike Meisler, was very "strict", warned her to be careful about the addictive nature of the drugs and did not refill the medications whenever she requested it. She stated that on some occasions he refilled them without a prescription. On other occasions she would bring in a new prescription from Dr. Gehbauer.
*1223 Clair testified that she met Meisler in December of 1983 after Young's departure. She stated that Meisler told her that he would refill whatever medications she wanted as long as she brought him the empty bottles. Clair testified that Meisler continuously refilled Valium, Doriden, Tylenol three and four, Vistaril, Ativan, Dolman, Noludar and Percodan. She stated that occasionally she brought in a prescription from Dr. Gehbauer for some of the drugs but never brought one in for Valium. Clair testified that after he had been giving her the Valium for over a year, he told her that he needed a prescription. When she asked him to telephone the doctor, he responded that he could not do that. She further testified that he told her to bring in the empty bottles for her sister and mother's Valium prescription and her father's pain pills and he would refill them changing the number. He would label the refills "for troubles" or "for problems".
Clair testified that most of the time she was physically unable to purchase the drugs herself and sent her boyfriend, Phillip to buy them. She stated that Meisler was well aware of her condition because on one occasion she went into the drugstore and was hardly able to stand up. She stated that without the drugs she experienced withdrawals consisting of vomiting, weakness, loss of bladder and bowel control and seizures. She stated that all of her income went for drugs. If she needed more she charged them. She stated Meisler never warned her about taking the drugs. She testified she thought he was a doctor, he seemed to be a doctor.
Clair testified that following a severe seizure she was taken to DeLeRonde Hospital. From there she was referred to Charity Hospital's detoxification unit. She remained in the emergency room for three days because she was unable to sign herself in to detox. After three days of seizure after seizure, she was admitted to the detox unit. She was discharged six days later on December 12, 1985.
On cross examination Clair testified that she did not feel she was addicted when she first began taking the drugs. She stated that at various times throughout the two year period of her drug use, she felt she was becoming more and more addicted but could not stop taking them. When asked if she ever thought it strange to be able to obtain a refill without a prescription, she responded "no" because she didn't feel she was addicted. Later she stated she didn't know if this was wrong because she relied on the druggist.
On re-direct, Clair stated that she had informed Dr. Gehbauer that Paris Drugs was refilling the drugs without a prescription. When asked by Dr. Gehbauer why she did not report this to the authorities, she stated she had no willpower. "... why would I report that" Why would I report him? He was giving me this medication. Without it I was very sick. I almost died without it."

PHILLIP GARGANUS:
Phillip Garganus testified that he is Clair's live-in boyfriend and father of their son. He stated that in 1982 Clair was taking her medications as prescribed. In late 1983 she began taking them "everyday, everyday, everyday." Without them she experienced seizures and could not function. Garganus testified that he provided for her physical needs such as bringing her to the bathroom and bathing her. He performed all the house work and cared for the children. He stated that because of her condition, he never left his son alone with her. He would arrange for neighbors and relatives to babysit while he was at work.
Garganus stated that Valium and sleeping pills were the main drugs Clair was taking. If she didn't have any he would go to Meisler and purchase them to keep her from having seizures. He testified that in 1984 and 1985 she was taking the drugs everyday. She spent all of her $1,500.00 per month social security check as well as his income to purchase the drugs. After Garganus was "laid off", they applied for food stamps. Garganus stated that when the social worker came to complete the application, Clair was so drugged she was unable to read and sign it. As a result the police took their son into protective custody. *1224 Garganus testified that during this same period of time, his stepdaughter, Tammy ran away to the home of her father. Clair eventually lost custody of Tammy. Garganus stated that it was after these incidents that Clair attempted to stop taking the drugs "cold turkey". Two days later she experienced a severe seizure and was taken to DeLaRonde Hospital. Because she had no insurance she was referred to Charity Hospital. She was unable to sign herself into the detox unit and remained for three days in the hallway of the emergency room. She was then admitted to detox.
Garganus testified that he didn't notify the authorities about Meisler because he "figured the pharmacist was knowing what he was doing.... He kept refilling it. I didn't know no different. I thought he was calling the doctors. I didn't know."

ASSIGNMENT OF ERROR 1:
Plaintiff contends that the comparative fault principles of Civil Code Article 2323[2] are not applicable to the instant case and therefore the trial court erred in submitting interrogatories concerning her fault to the jury. In support plaintiff relies on the comparative fault analysis in Johnson, Comparative Negligence and the Duty/Risk Analysis, 40 La.L.Rev. 319 (1980). She argues that a strict duty/risk analysis requires this court to find that her own fault should not be considered because it is so outweighed by the high degree of care owed by a phamarcist. Plaintiff refers this court to language in Turner v. New Orleans Public Service, 476 So.2d 800 (La.1985), and the pre-comparative fault cases of Boyer v. Johnson, 360 So.2d 1164 (La.1978) and Argus v. Scheppegrell, 472 So.2d 573 (La.1985).
In Turner our Supreme Court held that in pedestrian/motorist cases it was no longer appropriate to apply the Baumgartner[3] rule since comparative fault eliminated the harsh "all or nothing" results of contributory negligence. However, the court stated that "[c]are should be taken, however, to note that we do not hold that the victim's fault shall always reduce his compensation." Turner, at 804. In Boyer v. Johnson, supra, a pre-comparative case, the court held that the contributory negligence of a minor, illegally hired to drive a delivery truck, did not bar recovery for his wrongful death. In Argus v. Scheppegrell, supra, also a pre-comparative case, a teenager committed suicide as a result of drugs illegally prescribed by her physician. In the wrongful death claim against the physician, the Supreme Court held that because of the disparity of positions between the parties, the physician's duty encompassed protecting his patient from her own negligence. Thus contributory negligence was not a bar to recovery. In a footnote, however, the court noted that "... the legislative adoption of comparative fault after the incident ... may require a reexamination of this reasoning." Id. 472 So.2d at 574, ftn. 1.
Plaintiff asserts that, because the Turner court recognized that comparative fault may not be appropriate in every case, in those instances where contributory negligence was previously not a bar to recovery, the same rationale should be considered to preclude a victim's comparative fault as a defense. In particular, plaintiff urges that the pharmacist's high duty of care extends to the protection of the "helpless" patient. Analogizing to the disparity of positions in Argus v. Scheppegrell it is contended that victim fault is not applicable in this case.
Although we agree with the contention that comparative fault may not be applicable *1225 in all cases, under the facts of this case, we hold that it is appropriate. In Bell v. Jet Wheel Blast, 462 So.2d 166, 172 (La. 1985), the court noted: "The question of whether other classes of cases fall within the category to which comparative fault may apply must be decided on a case by case basis." See also, Howard v. Allstate Insurance Co., 510 So.2d 685 (La.App. 4th Cir.1987) wherein we held that courts have the discretion to determine if comparative fault principles are applicable. The courts have also recognized that, not only in negligence cases, but also in "relational" strict liability cases comparative fault is appropriate. See, Landry v. State, 495 So.2d 1284 (La.1986), an article 2317 case, and Howard, supra, an article 2321 case.
We appreciate the logic and reasoning of plaintiff's argument. Under a different factual setting that argument may be applicable. We also recognize that, because of the duties attendant to their profession, a high degree of care is placed on pharmacists. See, La.R.S. 37:1206; Trumbaturi v. Katz and Bestoff, 180 La. 915, 158 So. 16 (1934). That duty, however, does not encompass protecting against this plaintiff's own careless actions. Plaintiff was not a minor. She was aware of what she was doing and even assisted the pharmacist in obtaining the drugs illegally. She was not mentally deficient, and, by her own admission, was not addicted at the time she began soliciting drugs from Meisler. There is no serious disparity in positions to warrant a total disregard of the plaintiff's own fault. The evidence clearly supports the conclusion that she contributed to her own addiction. This conclusion is further supported by the jurisprudence and legislation which recognizes the capacity for a degree of fault on the part of an individual who consumes alcohol,[4] despite the fact that retailers face disciplinary action for selling or serving alcohol beverages to intoxicated persons. La.R.S. 26:90(A)(2); Bertrand v. Kratzer's Country Mart, 563 So.2d 1302 (La.App. 3rd Cir.1990).
We therefore hold that it was appropriate for the jury to consider plaintiff's own fault in reaching its verdict. We now consider that percentage of fault.
The jury found plaintiff fifty (50%) percent at fault in causing her addiction. When considering the relative fault of the parties, our Supreme Court provided guidelines in Watson v. State Farm Insurance Co., 469 So.2d 967 (La.1985). Citing Section 2(b) of the Uniform Comparative Fault Act of 1979,[5] the court stated:
"In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties." Id. 469 So.2d at 974.
Watson also made it clear that the above guidelines should be considered by an appellate court in conjunction with its "clearly wrong" or "manifestly erroneous" standard of appellate review.
The record is clear that Clair voluntarily and on her own volition engaged in activity that substantially contributed to her addiction, to wit; requesting refills of medications clearly marked "no refills"; ignoring the early warnings of Kim Young that the drugs she was taking were highly addictive; *1226 bringing Meisler her father's, mother's and sister's prescription bottles to be refilled and continuing, even after she became aware that she was becoming addicted, to solicit the drugs from Meisler.
In addition, Clair produced no independent medical evidence as to the length and severity of her addiction. She relied heavily on her own self serving testimony and that of her boyfriend. By her own admission, she was able to withdraw from her addiction within a matter of days while confined to Charity Hospital's detox unit.
Balanced against these facts we weigh the high duty of care of the pharmacist, Meisler. Meisler knew that he was illegally dispensing harmful drugs. Although Clair's addiction was not proven when she initially started taking the drugs, it is clear she subsequently became addicted. At that point in time, Meisler's position was far superior to that of Clair. The risk of harmful effects to her heightened, and Meisler was clearly aware of those risks. He was in the better position to prevent the harmful effects of her actions. Applying the Watson guidelines we conclude that the jury was clearly wrong in not apportioning the greater fault to him. We therefore reapportion fault at 35% to Clair and 50% to Meisler.

ASSIGNMENTS OF ERROR 2 AND 3:
Applying the principles of appellate review, as previously stated, we address the following:

PAST AND FUTURE MENTAL ANGUISH:
Clair asserts the jury was manifestly erroneous in not awarding her damages for past and future mental anguish. We disagree.
Damages for mental anguish are recoverable under Louisiana law. Gele v. Markey, 387 So.2d 1162 (La.1980). Plaintiff, however, has the burden of proving the causal relationship between the mental anguish and the negligent act of the defendant. Jordan v. Travelers Insurance Co., 231 So.2d 678 (La.App. 1st Cir.1970), writ issued, 256 La. 65, 235 So.2d 95 and writ den. 256 La. 68, 235 So.2d 96 (La.1970), dec. amended, 257 La. 995, 245 So.2d 151 (La. 1971). It is for the trier of fact, after weighing and evaluating all the evidence relating to the injuries, to either accept or reject the connection between the negligent conduct of the defendant and the injuries to the plaintiff. Tebbe v. Avegno, 435 So.2d 513 (La.App. 4th Cir.1983), writ not considered, 441 So.2d 753 (La.1983).
The only evidence of mental anguish was Clair's self-serving testimony. Her testimony clearly reveals that her mental and emotional difficulties existed prior to her addiction. These mental and emotional difficulties were the reason she sought medical help from Doctors Jackson and Gehbauer. Clair narrated her troubled life beginning with her mother giving her up to her grandparents. She married for the first time at the early age of 14, was later divorced and remarried several more times. She testified that the abuse by her fourth husband led her to become an alcoholic. Defending herself from a vicious attack, she killed him in self defense. In addition to these problems and tragedies, she testified the suicide of her brother and subsequent premature deaths of her sister and step father profoundly impacted on her emotional stability.
Given the record before us, we find no manifest error in the jury's determination that Clair failed to prove damages for past and future mental anguish.

PAST AND FUTURE PAIN AND SUFFERING:
The jury awarded Clair $4,000.00 for past and future pain and suffering. Clair asserts this amount is insufficient and should be increased.[6] We disagree.
The trier of fact is accorded "much discretion" in the award of damages. La.C.C. *1227 Art. 1999. Absent an abuse of that discretion, the award will not be disturbed. Boehm v. Bienemy, 508 So.2d 159 (La.App. 4th Cir.1987).
In the instant case, Clair failed to provide any independent medical evidence as to the length and severity of her addiction. The only evidence she provided the jury was her own testimony as to her injuries. Therefore, we cannot say the jury's award of $4,000.00 for past and future pain and suffering was an abuse of discretion.
For the foregoing reasons the judgment of the trial court is amended to reapportion fault as follows:
Clair at 35%
Meisler at 50%
Paris Road Drugs at 10%
Larry Renz at 5%
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Meisler dispensed to Clair, Valium, Doriden, Tylenol 3 and 4, Vistaril, Ativan, Dolmor, Noludar and Percodan.
[2] Acts 1979, No. 431, effective August 1, 1980 amended Article 2323 to provide as follows:

"When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss."
[3] Baumgartner v. State Farm Mutual Insurance Co., 356 So.2d 400 (La.1978), a pre-comparative fault case, held that the contributory negligence of a pedestrian in a motorist/pedestrian accident would not bar the pedestrian's recovery.
[4] La.R.S. 9:2800.1 codified the rule of Thraser v. Leggett, 373 So.2d 494 (La.1979), declaring that, "... the consumption of intoxicating beverages, rather than the sale or serving or furnishing of such beverages, is the proximate cause of an injury ... inflicted by an intoxicated person upon himself or upon another person."
[5] "In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relations between the conduct and the damages claimed."
[6] Clair relies on the awards in Bourne v. Seventh General Hospital, 546 So.2d 197 (La.App. 1st Cir.1989) and Argus v. Scheppegrell, supra. The facts of these cases are distinguishable. In both the decedents were minors and both died as a result of drug overdoses. Prior to death independent medical evidence showed both decedents experienced severe toxicity followed by loss of bodily functions and eventual death.