DOMENGEAUX, Judge.
Plaintiffs Jo Ann Moreau and Daniel Dauzat, Sr. brought suit against the State of Louisiana, Through the Department of Transportation and Development for the wrongful death of their son, Daniel Dau-zat, Jr., who died in a single vehicle auto accident on New Year’s Day, January 1, 1985, on La. Hwy. 29, in Avoyelles Parish. Additional passengers in the auto, plaintiffs Steven Brightwell, Dennis Scott Brightwell and Shelly Reese also filed suit against the State, Through the Department of Transportation and Development for the injuries they sustained in the aforementioned accident. Although separate suits were originally filed on behalf of both sets of plaintiffs, the cases were consolidated for trial. On appeal, a separate opinion is being rendered this day in case numbered 87-417, entitled Bñghtwell, et al v. State of Louisiana, Department of Transportation and Development, 527 So.2d 1228 (La.App.1988). However, because the issues in both cases are identical, all issues raised therein are addressed by this opinion.
The Trial Judge ruled in favor of the plaintiffs and found that the State was at fault in failing to properly warn the driver, Daniel Dauzat, Jr., of an upcoming hazardous curve on La. Hwy. 29 that, without fore-knowledge, could not have been safely negotiated at a speed exceeding 40 mph under the current driving conditions. The Trial Court ruled that the State’s failure to provide a “curve” warning sign and post a “40 mph” warning sign in the 55 mile per hour zone was the principal cause of the accident. The plaintiffs were awarded the following amounts:
Steven Brightwell. $ 22,608.00
*1223 Dennis Scott Brightwell .. $653,941.65
Shelly Reese. $ 43,685.64
Jo Ann Moreau. $150,000.00
Daniel Dauzat, Sr. $150,000.00
The State, who was also assessed court costs, has appealed this ruling based on the following seven assignments of error.
(1) The Trial Court erred in ruling that the curvature of the road was 11 degrees in one place.
(2) The Trial Court erred in ruling that the curve could not be safely negotiated at speeds in excess of forty (40) miles per hour under current conditions.
(3) The Trial Court erred in ruling that Danny Dauzat was unware of the curve.
(4) The Trial Court erred in ruling that the configuration of the road and bridge was “improper”.
(5) The Trial Court erred in ruling that no degree of fault could be attributed to the driver Danny Dauzat.
(6) The Trial Court erred in awarding Danny Dauzat’s parents $150,000.00 each for wrongful death damages.
(7) The Trial Court erred in finding the Department of Transportation and Development 100% liable for the injuries of the guest passengers in the Dauzat vehicle and in not finding Danny Dauzat 100% negligent and liable for the injuries of those passengers.
FACTS
On December 31, 1984, Danny Dauzat and Shelly Reese, both 18 years old and both residents of Bunkie, Louisiana, were going on their first date together to a New Year’s Eve party at a newly opened craw-fish processing plant in Whiteville, Louisiana. Whiteville is approximately 15 miles south of Bunkie, accessable by La. Hwy. 29. Numerous witnesses testified that Danny was unfamiliar with La. Hwy. 29 and that, on this particular night, he had to ask for directions to the party. It had rained intermittently all day and by nightfall, the roads were still wet. The weather conditions were very humid and often misty.
The couple left Bunkie at 7 p.m., trav-elled down La. Hwy. 29 without incident and arrived at the party around 7:30 p.m. At the party the couple met Shelly’s aunt and uncle, Candice and Hugh Brightwell, with whom Shelly resided in Bunkie. The Brightwell’s two sons, Scott (a/k/a Dennis), age 18, and Steven, age 19, had accompanied their parents to the party.
While at the party, Danny Dauzat was not seen drinking any alcohol. His parents and friends testified that Danny had a stomach condition which prevented him from consuming any alcohol, as it generally caused him to get sick. The plaintiffs introduced Danny’s hospital records from the year before which showed that Danny had suffered from an upper intestinal tract ailment. Scott was also not drinking on this night because he had a low grade fever. Soon after arriving, Scott left the party and rested at a friend’s house next door for the majority of the evening. Both Shelly and Steve testified that they drank in moderation.
At approximately 12:10 a.m., the four teenagers decided to return to Bunkie in Danny’s car to visit some friends and to pick up Shelly’s two year old daughter from her sitter. Danny drove, Shelly sat next to him, and Steve sat in the front passenger seat. Scott, who was still feeling ill, rested in the back seat. No evidence was introduced as to whether any occupant used seat belts.
As stated earier, various witnesses testified that Danny was unfamiliar with La. Hwy. 29. At a certain point, La. Hwy. 29 northbound veers sharply to the right after approximately three miles of straight roadway. Less than 200 yards after rounding the curve, the highway crosses a small bridge. Danny’s vehicle failed to successfully negotiate this curve. The car skidded 172 feet and ultimately crashed into the bridge abutment. Danny was in a coma for three hours and then died; the other three passengers suffered numerous serious injuries.
Originally constructed in 1961, La. Hwy. 29 was designed to safely accommodate an estimated 260 vehicles per day. At the *1224 time of trial, La. Hwy. 29 carried approximately 1,280 vehicles per day. It is undisputed that at the time of trial, La. Hwy. 29’s specifications did not conform to present day design specifications for highways that are expected to accommodate 1,280 vehicles per day. In fact, the specifications of La. Hwy. 29 did not comply with present design specifications for roads expected to accommodate 260 vehicles per day. However, the roadway was built in compliance with the specifications in effect in 1961 for highways built to accommodate 260 vehicles per day.
The plaintiffs alleged that the State was at fault in failing to upgrade the highway to present day design specifications, and, in particular, in failing to warn motorists of the upcoming curve. The plaintiffs argued that a curve warning sign and a 40 mph maximum speed limit sign was necessary as the sharp curve after the three mile straight stretch of roadway was unexpected and the curve could not be safely negotiated at a speed in excess of 40 mph. The plaintiffs presented evidence that, at one time, a sign had been placed 750 feet before the curve. Several witnesses including friends of Danny’s parents, Julius and Jenny Mayeaux, Danny’s father and girlfriend, Daniel Dauzat, Sr. and Evelyn Re-tif, and Danny’s best friend, Dale Duple-chein testified that on the afternoon after the accident they inspected the scene of the accident. Every witness testified that at approximately 750 feet from the curve, on the right hand side of the road, a diamond shaped sign was seen lying on the ground, face down. The sign was adjacent to what appeared to have been the metal post that once held up the sign. The metal post appeared to have been severed two feet from the ground and the top of the post appeared rusty, indicating that it had been exposed to the air for some time. Danny’s mother and stepfather, Evelyn and Girard Moreau, photographed the accident scene including the metal post stump on January 4, 1985, four days after the accident. These photos were introduced at trial. Every witness who viewed the accident scene on January 1, 1985, recognized the metal stump in the photos as what they saw on the afternoon of the accident.
As the sign was lying face down, no witness was able to testify what words were on the sign. However, Daniel Slocum, a life-long resident of Bunkie and a person who had been traveling on La. Hwy. 29 four to five times per week for the past four years testified on behalf of the plaintiffs. He stated that at the spot of the metal stump in the photos, there had been a curve warning sign and a 40 mph reduce speed sign. He also stated that the sign was down for approximately three months prior to the Dauzat accident. Without objection, Mr. Slocum went on to state that the sign was replaced a few weeks after this accident. At the time of trial, a curve warning and 40 mph sign was located at the exact spot where the metal stump had been located.
Without a warning sign, the speed limit on La. Hwy. 29 was 55 mph. Dr. Robert Lippe, the plaintiffs’ expert on accident reconstruction, estimated that the Dauzat vehicle was traveling at a speed of 58 mph prior to the time of impact. Doctor Lippe also measured the curvature of the roadway and found that it ranged from 6.44 to 10.91 degrees and, based on his calculations of the curvature, concluded that the fastest maximum safe possible speed was 40 mph and that a curve of this degree required a warning sign.
In contrast, Dr. Owen Dart, Jr., the defendants’ expert in accident reconstruction estimated that the curvature was 7 degrees and that the curve could be safely negotiated at a speed of between 45 and 50 mph. He stated that whoever determined that 40 mph was the maximum speed to be able to safely negotiate the curve was overly cautious. He also determined that the speed of the Dauzat vehicle was 67.5 mph. He considered the alleged excessive speed to be the primary reason for the accident. However, he did admit on cross-examination that, if traveling at night under rainy conditions, at a speed of 55 mph, without fore-knowledge of an upcoming curve and without warning signs, it would be very *1225 possible to lose control of a vehicle when entering this curve.
Danny Dauzat died as a result of this accident and the other three passengers suffered extensive serious injuries. Within thirty minutes of the accident the four victims were taken to Humana Hospital in Yille Platte. Danny and Scott were subsequently taken to Our Lady of Lourdes in Lafayette because of the more serious nature of their injuries. Danny was in a coma for three hours and died without ever regaining consciousness. However, both of Danny’s parents stated that Danny gave a sign of recognition to them while they saw him in the hospital.
Scott Brightwell was in a coma for eleven days and has sustained permanent brain damage. The Brightwells have subsequently moved from Louisiana to Michigan. Since the accident Scott has needed constant medical treatment and physical therapy. He is presently an inpatient at the Saline Community Hospital Head Trauma Center six hundred miles away from his parents’ home in Michigan. Dr. John N. Grimes, an expert in rehabilitative counseling treated Scott while Scott was in Louisiana. Doctor Grimes testified in regard to Scott’s injuries and future rehabilitative needs. He stated that even though Scott tested in the “dull normal” range of intelligence (IQ of 84), he does not have everyday judgment, reasoning and social skills, nor can he concentrate or respond to immediate memory situations. Doctor Grimes stated that Scott would only be employable under extremely supervised situations that would not require judgment or any type of independent thought and only if he had first received twelve to fifteen months of extensive inpatient therapy at an appropriate mental trauma treatment facility.
Steven Brightwell sustained a fractured hip and developed a non-specified severe pain in his right arm and back. He stated that he has lost 25 to 30 percent of the normal strength in his right arm and his leg muscles have atrophied. He suffered extreme pain caused by embedded glass in his arms, back and head, some of which could not be removed until weeks after the accident.
Shelly Reese fractured her pelvis in three places and crushed her left ankle. She also suffered from extensive amounts of embedded glass throughout her body. She was in a cast for eight weeks and then was required to use a walker for four additional weeks. Because her pelvis was weakened by the fractures, she will most likely experience difficulty with any future pregnancies. She is presently unable to stand or even sit for more than three hours and this has caused her to lose several jobs.
MANIFEST ERROR
The State argues that the Trial Judge committed manifest error in six separate factual determinations and has abused his discretion in awarding $150,000.00 to each of Danny Dauzat’s parents.
Questions of fact are generally left to the trier of fact and their finding should not be disturbed absent clear or manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). A review of the record shows that the factual determinations that the State contends were manifest error were based on the testimony of the plaintiff’s witnesses. In reaching his determinations, the Trial Judge apparently rejected the testimony of the defendants’ only witness, Doctor Dart, the defendant’s accident reconstruction expert. The rule regarding appellate review of conflicting testimony is well established as follows: where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring, 283 So.2d 716 (La.1973). With the foregoing standards of review in mind, we shall address each assignment of error argued by the State.
Initially, the State argues that the Trial Court erred in ruling that the road curvature was eleven (11) degrees in one place. Doctor Lippe, the plaintiffs’ accident reconstruction expert, stated that he measured the road at five (5) different *1226 spots by measuring from one edge of the road to the other. His measurements of the curvature ranged from 6.44 to 10.91 degrees (essentially 11 degrees when roundered to the nearest whole number). Doctor Dart, the State’s accident reconstruction expert measured the degree of curvature by measuring from the center line of the roadway to the curb. He determined that the road had a seven (7) degree curvature. When asked his opinion about the methods of measurement used by Doctor Lippe (edge to edge), Doctor Dart stated that Doctor Lippe’s method was an accepted alternative method of measurement of degree of curvature. Hence, no evidence was presented which would indicate that the Trial Judge committed manifest error in accepting Doctor Lippe’s measurement as an accurate method of measuring the degree of curvature and in his subsequent acceptance of Doctor Lippe’s measurement as the most accurate. This assignment of error has no merit.
The State next argues that the Trial Judge erred in ruling that the curve “could not be safely negotiated under the current driving conditions at speeds in excess of 40 mph unless the driver clearly anticipated it.” This ruling was heavily supported by numerous impartial witnesses’ testimony and by the photos of the curve submitted as evidence. Officer John Douglas, the police officer who investigated the accident, testified that he is very familiar with the curve as he travels on La. Hwy. 29 at least once a week. When questioned about the curve he stated:
Q. Trooper have you personally had any trouble negotiating that curve in the wet at 55 mph in the dark?
A. I don’t think that I’ve ever attempted it at 55 mph on the wet in the dark.
Q. Why have you not attempted it at 55 mph in the wet at night?
A. Its a pretty sharp curve and it’s pretty tough to negotiate in daylight on a dry road.
(Trial transcript page 243)
Additionally, Daniel Slocum, the resident of Bunkie who travels Hwy. 29 four to five times each week, stated again without objection, that, in his opinion, the curve is very dangerous because of the unexpectedness of a sharp veer to the right after three miles of straight roadway and, in particular, at night because the area is not illuminated. Both of these witnesses appeared highly credible because of their impartiality in the outcome of the case.
Additionally, the plaintiffs’ accident reconstruction expert, Doctor Lippe, concluded that the curve was unreasonably dangerous when a vehicle was traveling 55 mph at night, in the rain and when its driver was unaware of the upcoming curve. Even the State’s own witness, Doctor Dart, when presented with a hypothetical situation assuming the above facts, stated that it was entirely possible that a driver could lose control of his car in that situation.
The Trial Judge’s finding is most supported by the fact that, both before and after this accident the State erected the curve warning and a 40 mph speed limit sign. Hence, the State has apparently concluded that a slower speed and curve warning was and is necessary for a motorist to safely negotiate the curve. As there is ample substantive evidence supporting this determination, we find no error in this ruling by the Trial Court.
The State next argues that the Trial Court erred in concluding that Danny Dau-zat, the driver, was unaware of the curve. The only evidence introduced showing that Danny was aware of the curve was the fact that he drove down La. Hwy. 29 in order to get to the party in Whiteville. Testimony of every witness who was familiar with Danny stated that he was not familiar with this roadway. The State’s argument failed to consider the fact that Danny’s vehicle traveled from north to south when going to Whiteville. It is entirely possible that when traveling from south to north the curve is well marked and a driver is adequately alerted, or that the curve is one of a series of twists in the roadway for which the driver has had to slow down in order to negotiate. Regardless, one occasion to drive down a 15 mile stretch of highway is hardly sufficient to adequately put the average prudent driver on notice of what *1227 hazards a roadway poses when traveling in the opposite direction. This assignment of error has no merit.
The State next argues that the Trial Court erred in ruling that the shape and configuration of the road and bridge were improper. The Trial Court found that the principle cause of the accident was the State’s failure to warn Danny of the upcoming curve. Although the Court stated that the design of the roadway and bridge contributed to the severity of the accident, the Court definitively concluded that, notwithstanding these design effects, a warning sign would likely have avoided this accident. Hence, the design defects of the bridge and road were not held to be the cause of the accident. Therefore, the Trial Court’s statements as to these additional roadway defects were dicta and irrelevant.
The State next argues that the Trial Court erred in ruling that Danny Dauzat was free from fault, or conversely that the State was one hundred percent liable for the injuries of the guest passengers. The only evidence of negligence on the part of Danny Dauzat was Doctor Dart’s determination that the Dauzat vehicle was traveling 67.5 mph. Conversely, Doctor Lippe estimated Danny’s speed to be 58 mph. Doctor Dart based his estimate on two hundred (200) feet of skid marks and a friction coefficient of .49 which he determined by pouring water on the roadway on a dry day in July and then dragging a sack across it. Doctor Lippe based his speed estimate on one hundred seventy-two (172) feet of skid marks, as measured by Officer Douglas on the night of the accident, and a friction coefficient of .35, with he obtained as an average coefficient from the American Association of State Highways and Transportation Official Specifications Manual (AASHTO). The Trial Judge apparently believed the plaintiffs expert and concluded that, even though the plaintiff's estimated speed of 58 mph was greater than the 55 mph speed limit, it was nonetheless close enough to the 55 mph speed limit zone to indicate that Danny Dauzat was not negligent. Since the estimate of speed is still only an estimate, subject to some fluctuation, we find no manifest error in the Trial Court’s ruling that an estimated rate of 58 mph does not indicate fault on the part of Danny Dauzat.
There was no other evidence indicating fault on the part of Danny Dauzat. The Trial Judge ruled that the State was one hundred percent at fault in causing the accident by failing to provide the necessary warning signs. The evidence presented by the plaintiffs’ expert and other witnesses supports the Trial Judge’s ruling that this was the principal cause of the accident. The plaintiffs have amply proved that the signs were necessary for an unsuspecting driver to safely negotiate the upcoming curve at night and in wet weather. Clearly the State was at fault in not properly maintaining a necessary warning sign that had been down for three months prior to the accident. Adequate warning would have allowed the driver to slow down and anticipate the curve and thus, avoid this accident. Therefore, we find no manifest error by the Trial Judge in either of these determinations.
Finally, the State argues that the Trial Court abused its discretion in awarding $150,000.00 each to Danny Dauzat’s parents for wrongful death damages.
In the assessment of damages in cases of offenses, quasi-offenses and quasi-contracts much discretion must be left to the Judge or jury. La.C.C. art. 2324.1 Before a Court of Appeal can disturb a quantum award, the record must clearly reveal that the trier of fact abused his discretion in making its award; only after finding that the record supports that the lower court abused its much discretion can an Appellate Court disturb the award and then only to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded that Court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Prior awards under similar circumstances serve only as a general guide. The true question is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Reck v. Stevens, 373 So.2d 498 (La.1979).
*1228 The State argues in their brief that the plaintiffs failed to show any unusual circumstances in the relationship of Danny to his parents to warrant this award. Danny was eighteen years old, had just graduated from high school, and was a good student, friend and son. He was active in church affairs, civic groups, and helped those in need. He maintained a very close relationship with both of his parents despite the physical distance from his father who lived in New Orleans. Several witnesses testified as to the public displays of affection Danny always exhibited toward his mother. Danny’s father has since quit his job in New Orleans and moved back to Bunkie in order to spend more time with his two remaining children. At the trial, testimony from both parents indicated that they have had a very difficult time accepting Danny’s early tragic death. His mother visits his grave four times a week and his father refuses to believe that Danny is really dead. After reviewing wrongful death awards in the jurisprudence, we do not find the amount of $150,000.00 to each parent to be an abuse of the Trial Judge’s discretion.
For the foregoing reasons we affirm the judgment of the Trial Court. Costs on appeal are to be paid by the defendant.
AFFIRMED.