721 So.2d 64 (1998)
Eliza TURNER and Willie Bean
v.
The PARISH OF JEFFERSON, Through the DEPARTMENT OF RECREATION, Houma Motels, Inc. d/b/a Holiday Inn Holidome, ABC Insurance Company and XYZ Insurance Company.
No. 98-CA-336.
Court of Appeal of Louisiana, Fifth Circuit.
October 14, 1998.
*66 Curtis C. Kronlage, Charles A. Kronlage, Jr., Kronlage & Kronlage, APLC, New Orleans, for plaintiffs-appellants Eliza Turner and Willie Bean.
William P. Connick, Elliott M. Lonker, Metairie, for defendant-appellee Parish of Jefferson through Department of Recreation.
Robert E. Kerrigan, Jr., Charles F. Seeman, III, Deutsch, Kerrigan & Stiles, LLP, New Orleans, for defendants-appellees Houma Motels, Inc., et al.
Before WICKER and GOTHARD, JJ., and NESTOR L. CURRAULT, Jr., J. Pro Tem.
NESTOR L. CURRAULT, Jr., Judge Pro Tem.
Plaintiffs-appellants Eliza Turner and Willie Bean appeal a judgment of the district court, on a jury verdict, which found Ms. Turner to be partially at fault in the death of her daughter, Krystal. Appellants also contest the finding that the Parish of Jefferson was not liable, and that Houma Motels, Inc. d/b/a Holiday Inn Holidome (hereinafter "Holidome") was five percent at fault. Finally, appellants aver that the quantum is inadequate. For the reasons to follow, we reverse in part, affirm in part, amend, and render judgment.
Krystal Turner was the 12-year-old daughter of Ms. Eliza Turner and Mr. Willie Bean, who have never married. Chosen to be a member of the Jefferson Parish Recreation Department's All-Star girl's basketball team, Krystal was taken to the Holidome in Houma to participate in a basketball tournament. While there, she went swimming in the Holidome's pool and drowned. Her parents filed suit in the Twenty-Fourth Judicial District Court against the Parish of Jefferson and the Holidome, for survival damages and for wrongful death.
The trial was bifurcated. Because La.R.S. 13:5105 prohibits a jury trial in a suit against a political subdivision the trial court decided the issues of liability and damages as to Jefferson Parish. The jury considered the issues as to Holidome. Following trial, the jury found the Holidome guilty of negligence in the amount of five percent. The trial court and the jury agreed that the Parish of Jefferson was not guilty of any negligence, but that Krystal's fault amounted to 60 percent and that of Ms. Turner was 35%. Damages *67 in the amount of $40,000.00 were awarded. It is from this judgment that plaintiffs appeal.

DE NOVO REVIEW
As one assignment of error, plaintiff avers that the jury's verdict was hopelessly inconsistent, and that the trial court erred in failing to grant a new trial based on that inconsistency. On the special verdict form submitted by the court to the jurors, the answers to interrogatories were in pertinent part:
3. Was Holiday Inn Holidome guilty of negligence in the death of Krystal Turner?"Yes".
4. Was Holiday Inn Holidome's negligence a proximate cause of the damages, if any, sustained by Willie Bean and Eliza Turner?"No."
9. What is the degree of fault, expressed in a percentage, of those persons whose fault contributed to the accident?

Parish of Jefferson 0%
Holiday Inn Holidome 5%
Krystal Turner 60%
Eliza Turner 35%

In Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, the jury found that Ferrell was negligent and 30% at fault in the accident, but that his negligence was not a legal or proximate cause of the accident. The Supreme Court found this to be legal error.
La.C.C.P. Art. 1812(C) directs the jury to attribute a percentage of fault to a party only after it has determined that such party is negligent and that this negligence was a legal or proximate cause of the accident...
La.C.C.P. Art. 1813(E) mandates that when jury answers are inconsistent, the court shall not direct the entry of judgment, but may return the jury for further consideration, or may order a new trial. See Daigle v. White, 544 So.2d 1260 (La. App. 4 Cir.1989). The trial court in the present case followed neither prescribed course but entered a judgment on the verdict.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915 (La.1986); Suhor v. Gusse, 388 So.2d 755 (La.1980) and cases cited therein.
In Ferrell, the court remanded the case to the appellate court for such de novo review. In the case before us, the jury gave clearly inconsistent answers to the interrogatories by finding that Holiday Inn was guilty of negligence and assigning a five percent degree of fault to it, while also finding that the negligence was not a proximate cause of the accident. De novo review is mandated under La.C.C.P. arts. 1812(C) and 1813(C)[1], and Ferrell, supra. See also Gladney v. May, 29,373 (La.App. 2 Cir. 5/7/97), 697 So.2d 1022.
Appellee Holiday Inn cites Metz v. Howard, 93-726, (La.App. 5 Cir. 1/25/9), 631 So.2d 1248 and Bourque v. Gulf Marine Transp. Inc., 480 So.2d 337 (La.App. 3 Cir. 1985) for the proposition that the failure to object to the inconsistency at the reading of the verdict, and failure to call it to the judge's attention, constitutes a waiver of the right to de novo review. Both Bourque, supra, and Metz, supra, hold that the failure to call the matter to the attention of the trial judge at the reading of the verdict or allude *68 to such in any post-trial motions results in waiver.
In the present case, the record shows that plaintiff filed a motion for a JNOV or alternatively, for new trial or additur. In the motion, the plaintiffs pointed out the inconsistency to the trial court, which nevertheless denied the motions. Plaintiffs have not waived the right to de novo review of the assessment of liability in the present case. We agree with the Gladney court that regarding the jury's evaluation and fact-finding as to quantum, the manifest error standard of review remains applicable.
Further, because the jury verdict and the judgment of the trial court were consistent, the manifest error/clearly wrong standard of review is appropriate in reviewing the finding of no liability on the part of the Parish. Because La.R.S. 13:5105 prohibits a jury trial in a suit against a political subdivision, the trial court decided the issues of liability and damages as to Jefferson Parish.

TESTIMONY AND EVIDENCE
Because of illness on the day of trial, Alan Frey was unable to testify. The parties agreed to the reading and admission of his deposition at trial in lieu of his testimony. Mr. Frey is a volunteer coach for Jefferson Parish, and was head coach of the Jefferson Parish East Bank girls all-star team. He first knew Krystal Turner when she tried out for the team in January of 1996. Krystal was a very accomplished basketball player; having coached her, he was not aware of any physical problems with asthma which she may have had. With reference to the tournament in Houma, the Parish originally determined that the team would stay over during the tournament; however, when they realized how many teams from Jefferson would participate, they determined that the teams would commute. Because the children had already been told they would be staying at the Holidome, Frey called a parents' meeting to discuss raising money to pay for the trip. Ms. Turner did not attend the meeting. Frey did not recall if the subject of swimming came up at that meeting, "... but it was kind of a given...". No Parish rules and regulations regarding swimming were brought up. Prior to the trip, Ms. Turner was not asked if Krystal could swim.
Biddy Basketball is a franchise league which the Parish takes part in. Some of the rules and regulations of Biddy Basketball are incorporated into the Jefferson Parish program, and some are not. Frey was aware of the prohibition against swimming during basketball tournaments, but the Parish does not have such a rule.
At check-in at the Holidome, Frey was not informed of any rules or regulations regarding the children in the swimming pool. After the tournament game on Saturday, which finished at 7:00 p.m., the group went to eat. They finished at around 8:30 p.m., arriving back at the hotel at around 9:00 p.m. The pool closed at 10:00 p.m. Most of the kids were in the pool, and Frey began talking to them from pool side. There were a lot of people in the pool at that time, somewhere between 30 and 50. Prior to the children on the team going into the pool, Frey did not give them any instructions or rules about swimming. He did not inquire whether any of them could swim; he did not tell them to remain on the shallow end of the pool. He did not observe any security personnel monitoring activities around the pool.
Krystal was wearing a T-shirt and shorts which Frey's wife had donated to her. Frey first realized there was a problem when someone yelled for him; he turned and saw Krystal in the arms of Tony Doby. Someone began to administer CPR; Frey ran to get someone to call 911. Prior to the accident, Frey remembered seeing her playing beach ball with the other girls.
Krystal was taken to the hospital. Frey followed, and found out shortly thereafter that she had died. Frey believed that he and the other coaching personnel were charged with the responsibility of supervising and monitoring the children on his team; the only coaches present at the time were himself and Christy Thieler. He did not think that he could have prevented Krystal from drowning.
There was no lifeguard at the pool, nor were there any buoys or lifelines.
*69 Alan Thibodeaux, manager of the Holidome in Houma, testified that the hotel is a two-story building, with the focal point of the entertainment area under the central atrium. The pool is in the center of the atrium. The pool is irregularly shaped, and is seven and one-half feet at its deepest end. There is a marking of three feet on the side at the shallow end, and markings of six feet on either side, but no marking on the inside coping by the deep side, which could be seen while swimming. There is a mark on the decking indicating a depth of seven and onehalf feet. The pool slopes from three feet to five feet six inches and is about 30 feet long; however, the slope from five feet six inches to the deepest part is twelve feet. There are two lights in the pool, one at each of the shallow and deep ends. The pool is approximately nine hundred seventy square feet.
Holidome has had biddy basketball teams come to stay for several years, and Thibodeaux knew there would be children using the pool. He knew there would be eight or nine groups of children from southeastern Louisiana on that particular weekend. Holidome had no regulation as to the number of people who could use the pool at one time. There was no lifeguard and to add such a position, even on those occasions when a lot of people would be swimming, would be a decision made by the company. Thibodeaux could have recommended a temporary lifeguard, but did not feel that it was necessary.
Thibodeaux knew that the pool rope, or life line at the deep end, had broken, but he could not remember when it happened. The rope was to have been repaired locally. He knew that the pool became cloudy when subjected to heavy use, and if the employees could not see the bottom, they were instructed to close the pool. Safety devices included a "shepherd's hook" (a long pole with a hook on the end), and a life ring, located on the wall adjacent to the pool. The pool was not restricted to people who could swim, nor did the management inform the coaches not to allow children in the pool who could not swim.
Additional security guards were assigned to the pool area, to guard against inappropriate horseplay. While the security people were instructed in pool safety, they were not lifeguards. There was a previous incident approximately one year earlier, in which a three-year-old child wandered into the pool at about 10:00 o'clock in the evening. A guest pulled the child out. The pool is generally serviced between 7:30-9:00 a.m., at which time it is cleaned and vacuumed, the water condition is checked and chlorine is added.
After Krystal drowned, Thibodeaux was called to the hotel and the situation was discussed with the security guards. He recalled reading some reports in which the guards reported asking some children to stop horse playing, but did not know which team those children belonged to. He had no information or recollection that any of the parents or coaches from Jefferson Parish were drinking alcohol on the night of the accident. He had no personal knowledge of how many people were in the pool that night. The water was slightly cloudy, but he could see coins in the pool.
Wayne Stewart, a security guard, was employed at the Holidome on the night of the accident. The manager and the other guard told him that the pool was crowded. There were forty or fifty children in the pool that night and about one hundred people around the decking, at the tables, etc. There were problems with some children running and diving. The Jefferson Parish group of children were playing ball in the pool. The pool water started to get cloudy, and he could not quite see the bottom of the pool. According to Stewart, there were no life lines in the pool. Both guards and the manager were called to different parts of the hotel for different reasons; when he returned to the pool area, the accident had taken place. Someone had given the victim CPR and 911 was called.
Sometime after the drowning Stewart was asked to make a statement to the company's attorney. Thibodeaux tried to get him to reword his report, and he followed those suggestions. Stewart admitted that he had been fired from the Holidome and further, was currently incarcerated in Dixon Correctional Institute on a charge for second degree battery (an unrelated incident).
*70 Brian Bordes, a coach with the Jefferson Parish Recreation Department, came back to the hotel from dinner at the time Krystal was being taken out of the pool. At that time, there were 20-30 kids in the pool, and 30-40 parents standing around it. The water was extremely cloudy, and you could not see more than about three feet down. There was no life line at either the deep or shallow end. In connection with their teams, Bordes and Frey stayed at the same hotel many times on various weekends. They always swim on these occasions; the coaches are always with the team in all their activities. On this occasion there were about fourteen parents and four coaches with the eleven and twelve-year-olds on the team.
Dr. Gerald Liuzza, a forensic pathologist, was retained to determine whether or not there would be any period of consciousness during drowning in which a person could experience pain and suffering. After examining the autopsy report, the death certificate, and the toxicology report, Dr. Liuzza stated there was no evidence of foul play nor of alcohol consumption. Krystal died by drowning, a form of asphyxia. Often people who drown are initially conscious, clawing for surface. After they go underwater, a person becomes unconscious within a matter of 15-20 seconds and water is gasped into the lungs. Brain death occurs within 6-8 minutes. In the present case it was impossible to state how long Krystal may have been conscious. Dr. Liuzza had been told that Krystal had one seizure some years before she drowned. He thought it unlikely that she had another seizure at this time, and it was his opinion that more likely than not she did not drown as a result of a seizure. The witness could not say with absolute assurance, but opined that Krystal suffered emotional and physical pain before she died.
Lisa Landry, the manager on duty on the night of the accident, remembered having seen a life line at the shallow end of the pool, but never one at the deep end. Ms. Landry passed by the pool once every hour or so as part of her duties. She estimated there were about 40 people in the pool that night (although in her earlier deposition she estimated the number of children to be between 50-60). Thibodeaux never gave her any instructions regarding the capacity of the pool, or told her to advise the coaches about swimming. Ms. Landry testified that there has never been a lifeguard there and when Krystal was pulled out the water was clear.
Michael Fazzio, the other security guard on duty on the night of the accident, stated that his duties were to patrol the area of the hotel. He was also to do numerous other things, from maintenance to answering telephones. He had no training in water safety. There was never a life line at the deep end of the pool. He saw the pool at around 9:00 p.m. and at that time there were 45-50 people in the water and about 90 around the deck. The noise level was very loud, and there was some horseplay going on. He told the children to stop the horseplay, and told the coaches to ask the kids to stop. There was no rule about pool capacity. At that time, one could not see the bottom of the pool at the deep end. At the time of the incident, he heard someone scream, and he ran over to the crowd. Someone was performing CPR on Krystal. The other kids said they thought she was playing. Thibodeaux told him to change his report, to include a notation about the coaches drinking and letting team members run wild; he was also instructed to note that the water was clear. He admitted that Thibodeaux had fired him (for unrelated reasons). On cross-examination, Fazzio admitted having no independent recollection whether any coaches from Jefferson Parish were drinking. While kids from all the teams were in the pool, he could not be certain which ones engaging in horseplay might have been from Jefferson.
Anthony Doby, then sixteen-years-old, testified that he was at the tournament because his sister was a member of the Jefferson Parish All Star team. On that night, he and his mother were pool side when the team came back from dinner. He saw Krystal standing around for a while, and then she entered the pool. He saw her in the middle, where she was standing in water a little below her shoulders. They began to play tap ball and formed a circle. Krystal left the circle a few times going into the six-foot depth area to get the ball. On one occasion, *71 she was face down floating. Doby asked her what she was doing and she said she was floating. They continued to play ball and Krystal was kicking and splashing a lot of water not in the normal manner of swimming. He grabbed her, and again asked her what she was doing, to which she replied that she was swimming. When he asked if she was going to go back, she answered that she was going to stay and swim. She never appeared to be in distress. Krystal never came back to play ball.
Six or seven minutes later, after the ball was knocked back, Doby swam to retrieve it and in walking back, he stepped on something and assumed it was a toy. He looked down to see what it was, but could not see to the bottom. A few seconds later, he again went to get the ball, at which time he decided to see what was in the water. At that time, he found Krystal's body. This was at about the six-foot depth level. He swam back to the top of the pool and because it was so loud, he had to scream a few times to get the attention of the coaches. He went back under and brought the body up, pushing her to the side of the pool.
Swimming was a normal event at the team events. When he came up after finding Krystal, Coach Frey was about two or three feet away from the pool. He would have heard Krystal if she had yelled for help.
Adrian Orgeron, a certified lifeguard, testified as an expert on aquatic safety. The purpose of a lifeline is to alert the swimmer that the depth is about to change. The Sanitary Code in Louisiana requires hotel and motel pools to have water depth marked on the inside wall of the pool, as well as on the deck or outside wall. The Holidome pool did not have the deepest end marked inside the pool. Further, the outside depth markers should be positioned to been seen from the water side. Depth markers should be installed at the maximum and minimum water depth at all points of slope change. The Holidome pool does not have a maximum depth mark. A float line should designate the deep end of the pool. According to the regulations, the water should be sufficiently clear to see a six-inch black disk at the bottom of the deep end.
Ms. Orgeron opined that the Holidome pool was unsafe because the float (life) line was absent, and because there was no lifeguard on duty, given the nature of the activity at the hotel that weekend. She felt that the Parish was negligent because the chaperones had not asked if the children could swim, or specifically put people to watch specific kids. She did not have any information as to whether Krystal knew, or did not know, the depth of the pool which she was in. It could be imprudent for someone who does not know how to swim to get into a pool, and to go in water over their head.
Dr. Carmela Tardo, a physician specializing in child neurology, testified as an expert in such after reviewing the autopsy report, Krystal's hospital records at East Jefferson, and a report from Dr. Liuzza. In her opinion, it was more probable than not that Krystal did not sustain an epileptic seizure in the swimming pool, and that an epileptic seizure was not a contributing factor in her death. The basis for the assumption was that there were no subsequent seizures since 1988 when Krystal was brought to East Jefferson Hospital, and that Krystal had a normal EKG following the seizure.
Mr. Willie Bean, Krystal's father, testified that shortly after the birth of his daughter he parted from her mother to whom he was not married. He remained in the same neighborhood and occasionally saw Krystal after the age of nine or ten when she started to play ball. He never supported her, but did occasionally give her money; he loved his daughter. In Fort Walton Beach, Florida, at the time of the accident, he received a call that Krystal had drowned. He was devastated, regretting the time that he had not spent with her. He never helped to raise her, or exercise visitation. He did not phone her although he has given her a few presents for birthdays and Christmas.
Ms. Eliza Turner, Krystal's mother, testified that Krystal was a friendly child, who did not get into trouble. She loved basketball, and other sports. Before the tournament in Houma, she had never been on an overnight trip. Krystal did not swim, and had no experience of pools. Ms. Turner did *72 attend a meeting when Krystal was trying out for the team. She filled out an information and permission card, on which she indicated that Krystal had asthma. She testified that she was not advised that Krystal would be able to go swimming on the trip, and did not give her permission for the child to do so. Krystal did not own a swim suit. On the morning her daughter left for the trip, she took off from her job to send her off, but could not attend the tournament with her.
Krystal had meningitis at two months of age, and a seizure in 1988, when she was brought to East Jefferson. She was treated and given phenobarbital; the child had no further symptoms after that and did not take any further medication for that condition. Krystal helped her mother around the house doing chores and looking after the other two children.
On the night of the accident, a neighbor came to tell her that she had received a phone call, and that there had been an accident. Ms. Turner drove to Houma with her mother and extended family, stopping at two hospitals before finding the right one. A coach whom she saw told her that Krystal had drowned; after waiting for forty-five minutes, she was taken to the room. Krystal was lying on a bed with water coming from her nose and mouth, and Ms. Turner realized she was dead. She testified, "I just wanted to pick her up and hold her. I didn't want it to be her. I didn't want it to be her." She now feels that a part of her is gone. She raised Krystal alone, without a father. The other children cry for her.
On cross-examination, Ms. Turner admitted that she had filled out various Parish permission forms indicating that Krystal was in good health. She talked with Coach Frey on the phone about the Houma trip, but the subject of swimming did not come up. She felt that Krystal was mature enough not to put herself in a dangerous situation.
Sherry Fourcade, a member of the team on which Krystal played, testified that Krystal told her she could swim. While in the pool, Krystal did not appear to be in any distress, and she never heard Krystal yell for help. Coach Frey was standing right next to the pool while the girls played ball. Swimming was an activity which usually took place during these tournaments. Sherry was told that if there was time between games that they could swim. Krystal never evidenced any physical problems during practice or play.
Karen Fourcade, mother of Sherry, testified that there were meetings with the parents in connection with tryouts for the team and other meetings after the team was picked. At one of the meetings, money for the trip was discussed along with the information that the kids could go swimming if time allowed. Ms. Turner did not attend that meeting. On the night of the accident, the team returned from dinner between 8:45 and 9:00 p.m. Several of the girls got in the pool, including Krystal. They were playing ball. Around the pool were several coaches, including Coach Frey and Christie Thieler. The parents who had younger children were observing the pool and some other parents were sitting by the deeper end where the ball game was being played. Krystal did not evidence any distress, nor did Mrs. Fourcade hear her yell for help. The noise level that night was loud, and there were from 100-200 people around the pool. The water in the pool was cloudy when they pulled Krystal out and she could not see the bottom of the pool. Inside the pool itself, it was dark, as one of the lights was off. There was no lifeline present in the deep portion. Coach Frey was close enough to have observed the conditions of the pool.
Michael Quigley, director of the Jefferson Parish Department of Parks and Recreation, testified that he knew Alan Frey for 15 years. Frey has done an outstanding job, and is a very responsible person. Jefferson participates in biddy basketball, a franchise program. Jefferson does not follow all the rules and regulations of the program, such as playing time rules, types of goals, etc. The Parish does not follow the biddy prohibition against swimming and the program does not enforce the rule. Jefferson has always allowed its teams to swim on out of town trips.
Richard Fourcade, father of Sherry and husband of Karen, testified that the water in the pool at the time of the accident was *73 somewhat cloudy. There was one security guard around the area. At that time there were 20-30 people in the pool and the team members were in the middle playing ball. It was noisy, with about 100 people around the pool area. He testified that the lighting was "better than dim," and he thought the pool lights were on. He conversed with Coach Frey at pool side, and they occasionally glanced into the pool. He did not see Krystal in distress.
On cross-examination, Mr. Fourcade did not recall Coach Frey bringing up the subject of swimming at the pre-tournament meetings. While all the girls who had played on the tournament teams previously knew that swimming was a usual activity, Krystal had never before attended any such road trip. Mr. Fourcade believed that the only child who did not have parents at the tournament was Krystal. He thought the pool was six feet deep, because that was the highest marking that he saw. The court allowed hearsay testimony to the effect that Krystal's grandmother later told him that Krystal had recently suffered a seizure and was on medication.

ANALYSIS

LIABILITY OF HOLIDOME
The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-infact of the plaintiffs injuries (the cause-infact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225.
Duty is a question of law. A hotel owes a duty to its patron to exercise reasonable and ordinary care including maintaining the premises in a reasonably safe and suitable condition. Jones v. Hyatt Corp. of Delaware, 94-2194 (La.App. 4 Cir. 7/26/95), 681 So.2d 381; Johnson v. Beavers 496 So.2d 1251 (La.App. 5 Cir.1986). The focal point of the entertainment area of the Holidome is the central atrium, with the pool predominating. Consequently, Holidome's duty to exercise reasonable care clearly extended to the use of the pool by its guests.
In Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979), the court discussed the burden of proof required in order to establish owner liability under Civil Code Articles 2315 and 2316:
In determining an owner's liability under Civil Code Articles 2315 and 2316 the test had been stated to be whether in the management of his property he had acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La. 1976). The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm.... In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. The duty would be greater to a person of young age and immature judgment. It would be lesser to a person with experience, knowledge and familiarity with the premises.
Massey on Behalf of Massey v. Schwegmann Giant Super Markets, Inc., 557 So.2d 280 (La.App. 4 Cir.1990). See also DeLaune v. Medical Center of Baton Rouge, Inc., 95 1190 (La.App. 1 Cir. 10/25/96), 683 So.2d 859.
We find that Holidome acted unreasonably by maintaining its pool in an unsafe manner, under all the circumstances before us. The testimony establishes that Holidome never employed a lifeguard. The management of the hotel knew that a number of teams of children ages 10-12 would be staying that weekend for the tournament, and had the authority to request a temporary *74 lifeguard, yet failed to do so. Furthermore, there was no one with water safety training assigned to monitor the safety and security of the swimmers, although the management was obviously aware that the number of teams, coaches, parents, and siblings connected with the teams would constitute a substantial percentage of its occupied rooms. Management was aware from previous experience that these guests usually use the pool area. There was no requirement relative to pool capacity, and the pool was, by all accounts, very crowded in the evening. Such fact was known to the hotel's security employees, whose only action relative to the swimmers was to prevent "horseplay". The surrounding area was also extremely crowded and very noisy, making it unlikely that a swimmer in distress would be readily observed. The pool had no safety rope or lifeline at the deep end of the pool, and according to the employees, the rope had been missing for some time. Depth markers inside the pool did not display the pool depth at seven and one-half feet, and the deck marker of that depth was difficult to see from inside the pool. The testimony of Ms. Orgeron established that lack of these markers and safety ropes were violative of the Louisiana Sanitary Code.
Testimony also established that the water in the pool was cloudy, by the time Krystal drowned, to the extent that the bottom of the pool was obscured. The effect of this is obvious because when Mr. Doby touched Krystal's body with his foot, he did not know that he stepped on the body of a child, perhaps at that point still viable, but thought he had touched a toy. No one could see Krystal, a tall, dark, young African-American, at the bottom of the pool.
The Supreme Court in St. Hill v. Tabor, 542 So.2d 499 (La.1989), found that the defendant therein acted unreasonably by hosting a swimming party with a large number of guests, allowing the swimmers to engage in horseplay, allowing the swimming to continue once the water became cloudy, and failing to provide a non-party, participant lifeguard. Alcohol was served to the minors in St. Hill; however, in the present case, there was a stipulation that alcohol was not a factor. This fact is not controlling in the presence of the other, equally powerful factors indicating negligence.
By this conduct, and considering the inherent dangers accompanying a swimming pool under the best of circumstances and the young ages of most of the guests, [Mrs. Falgout] breached her duty to act as a "reasonable" person and to guard against unreasonable risks of injury or harm to her guests.

St. Hill, supra.

As did the Supreme Court there, we also find that the particular risk that one of the guests would drown was clearly within the scope of the duty. The whole purpose of maintaining clear water, providing a lifeguard, guarding against overcrowding, providing a safety rope and depth markers, is to insure that there are not accidents in the pool, specifically drownings. St. Hill, supra. Krystal, young and of immature judgment, unfamiliar with pools in general and this one in particular, was at great risk of drowning in the pool provided by Holidome. In summary, Holidome had a duty to act in a reasonable manner, which duty it breached. The particular risk of drowning was within the scope of that duty, and was a cause in fact of Krystal's drowning.

PARISH OF JEFFERSON
A person (non parent) who has actually undertaken the control and supervision of a child has a duty to use reasonable care to protect the child from injury. L.P. v. Oubre, 547 So.2d 1320 (La.App. 5 Cir.1989); Doe v. Jeansonne, 97-795 (La.App. 3 Cir. 12/10/97), 704 So.2d 1240; Mayer on Behalf of Mayer v. Tulane Medical Center, 527 So.2d 329 (La.App. 4 Cir.1988). While such a person is not an insurer of the child's safety, he is required to use reasonable care commensurate with the foreseeable risk of harm to which the child might be subjected while under his control and supervision. Mayer, supra; Doe, supra.
In the present case, Krystal was one of two children who were not accompanied by their parents. There were four coaches. Mr. Frey admitted in his deposition that it was the coaches' responsibility to supervise *75 and monitor the children on their team. The parents who testified stated that they watched their own children carefully, as well they should. The crowded state of the pool and surrounding area, the cloudy water, the lack of some basic safety precautions such as the safety rope and adequate depth markers, and the absence of a lifeguard, should have put anyone on notice that the condition of the pool was unsafe. Acting in loco parentis, the coaches had a duty to monitor the children under their supervision with reasonable care under the circumstances, considering the age of the children and their immature judgment, and the conditions of the pool. We conclude that reasonable attention to those children, especially those without other family members to watch over them, would have enabled the coaches to be aware of Krystal's activities, her sudden absence from the group for more than seven minutes, and ascertained her whereabouts. Had she been properly monitored, as were the other children, it is reasonable to assume that she would have been noticed while in distress or found much earlier.
Moreover, the Parish had a duty to ascertain whether or not Krystal could swim and obtain parental permission for her to do so. The activities to which Ms. Turner released Krystal into the custody of the parish involved playing basketball. Frey testified that the meeting which Ms. Turner missed did not include a discussion on swimming, and there is no evidence of record that she was aware of the situation. Rather, it is clear that the more experienced players and their families, who had been on such trips before and stayed in such hotels, know there were pools which they would be allowed to use. Krystal had never been away from home before. There is nothing in the record to evidence that Ms. Turner knew of the possibility, or that she gave her permission for Krystal to go swimming.
Liability is imposed where there is a causal connection between the lack of supervision and the accident that could have been avoided by the exercise of the required degree of supervision. Gary on Behalf of Gary v. Meche, 626 So.2d 901 (La.App. 3 Cir.1993); Drueding v. St. Paul Fire & Marine Ins. Co., 482 So.2d 83 (La.App. 4 Cir.1986). Had the Parish ascertained that Krystal could not swim, the accident could have been prevented by not allowing her in the pool.
The Parish had a duty to exercise reasonable care over Krystal to protect her from injury. The conditions of the pool at the Holidome created a foreseeable risk of injury or drowning. Under the circumstances of this particular case, the risk of drowning was within the scope of that duty of the Parish to prevent, and the Parish failed to exercise reasonable supervision of Krystal. That failure was a cause in fact of her death. Therefore, we find that the trial court was manifestly erroneous in finding the Parish not to be at fault and we reverse that determination.

KRYSTAL TURNER
Krystal was 12-years-old when she died, and by her mother's account, she could not swim and was unfamiliar with pools. Nevertheless, she entered the pool and participated in the activities. Mr. Doby twice thought that she might be in distress, noticing her floating, and then kicking and splashing. On both occasions she indicated no problems and even told him that she was "swimming". Krystal's mother agreed that her daughter was mature enough not to put herself into a dangerous situation.
The test is whether the particular child, considering her age, background, and inherent intelligence, indulged in gross disregard of her own safety in the face of a known risk, understood and perceived the danger. Simmons v. Beauregard Parish School Board, 315 So.2d 883 (La.App. 3 Cir.1975), writ denied, 320 So.2d 207 (La. 1975).
Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080 (La.1982).
Other cases have recognized that a 12-year-old child is capable of being negligent or contributorily negligent, implying that a child of that age is considered to have reached a sufficient point in age, growth and judgment to be held responsible for their own acts, depending on the circumstances of each case. Daniels v. Dauphine, 557 So.2d 1062 (La.App. 2 Cir.1990). See also Bell v. *76 USAA Cas. Ins. Co., 30,172, (La.App. 2 Cir. 1/21/98), 707 So.2d 102. While determination of a child's capacity to be negligent is not the same as determination of the duty owed to a child, both determinations involve consideration of the child's ability to appreciate the dangers and risks of circumstances with which he is confronted. Daniels, supra.
Under the circumstances, we find that Krystal was aware of the risk of getting into the pool without being able to swim, and therefore that she acted unreasonably under the circumstances. The risk of her drowning was within the scope of her duty to act reasonably. St. Hill, supra.
We note in this regard, however, and in regard to assessment of fault as to Ms. Turner, that the record is devoid of any evidence whatsoever that Krystal's drowning was a result of, or connected to, any physical condition from which she suffered. Whether or not she had epilepsy or asthma, the medical evidence and opinions on the cause of Krystal's death do not disclose any connection between any such conditions and the drowning. Krystal's liability is contingent solely on her inability to swim and her decision to attempt to do so anyway by entering and playing in the crowded pool.

MS. TURNER
As stated above, there is no evidence that any physical condition of Krystal, whether or not disclosed to Jefferson Parish, contributed to her death. However, the evidence indicates that there was one meeting, which Ms. Turner did not attend, which encompassed a discussion on swimming and the fact that the children would be allowed to go in the pool. Further, swimming on such trips was a routine occurrence, and the children were told they would be able to swim if time permitted. We take judicial notice of the fact that the vast majority of hotels and motels have swimming pools, and that Ms. Turner must be held to have knowledge of such a commonplace fact. Ms. Turner should have been aware of all the details of the trip on which her daughter was to be sent, including the very strong possibility of the children going swimming, and informed the coaches that Krystal could not swim. While we do not question Ms. Turner's motherly concern and the efforts she made on Krystal's behalf, under all the facts and circumstances as we are obliged to analyze them, Ms. Turner must be held to have been negligent as a matter of law.
In summary, applying the factors used by the Supreme Court in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), we find that Holidome is sixty percent (60%) at fault; that the Parish of Jefferson is 10% at fault; and Ms. Turner and Krystal are each fifteen percent (15%) at fault in these proceedings.

DAMAGES
Our review of damage awards is limited to a finding of abuse of the trial court's great discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, supra; Jeffery v. Thibaut Oil Co., 94-851 (La.App. 5 Cir. 3/1/95), 652 So.2d 1021. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Youn, supra.
Plaintiffs filed for damages for wrongful death, and for survival damages. The jury awarded plaintiffs $40,000.00. Under the facts and circumstances of this case, and considering the effects of Krystal's death on Krystal and her mother, the award is a clear abuse of discretion.
Under La.C.C.P. art. 2315.1, the surviving father and mother of the deceased have an action for damages suffered by their child prior to her death. In St. Hill v. Tabor, 549 So.2d 870 (La.App. 5 Cir.1989), on remand, this court awarded damages on the basis of reasons expressed in Judge Bowes' vigorous dissent in the original opinion, at 532 So.2d 776 (La.App. 5 Cir.1988). There, after a quantum review, we found damages in the amount of $15,000 to be appropriate for *77 the victim's suffering in a similar drowning incident. A recent quantum search has turned up no other comparable cases, although we note that in Lantier v. Aetna Cas. & Sur. Co., 614 So.2d 1346 (La.App. 3 Cir. 1993), awards to two drowning victims of $10,000.00 were affirmed. Wall v. Progressive Barge Line, Inc., 97-0665 (La.App. 4 Cir. 10/29/97), 703 So.2d 681, affirmed an award of $50,000.00 to a drowning victim, finding it could have been based on the asphyxiation of a drowning victim, that the victim was more probably than not conscious when he entered the water, and experienced some pain and suffering in the process of drowning. Dent v. Perkins, 629 So.2d 1354 (La.App. 4 Cir.1993), affirmed an award of $50,000.00 for an infant who lived only 36 hours after birth and was never conscious.
Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any suffering or pain on the part of the deceased by his actions or otherwise. Prince v. Mattalino, 583 So.2d 541 (La. App. 3 Cir.1991). The pain and suffering of a deceased are not assumed; nonetheless, awards in survival actions have been upheld as within the trial court's discretion even in the absence of testimony of the deceased's pre-death pain.
Jones v. State Through Dept. of Health and Hospitals, 95-1130 (La.App. 3 Cir. 3/27/96), 671 So.2d 1074.
Considering all this jurisprudence, as well as the cases discussed in St. Hill, supra, and keeping in mind the medical testimony that Krystal was asphyxiated, we find that an award of $15,000.00 is the lowest appropriate award which the jury could have given for Krystal's pain and suffering prior to her death.
Relative to the wrongful death claims, again we note St. Hill, supra, in which we found an award of $100,000.00 to each parent to be appropriate (the parents did not live together; however, in that family the father had a close and loving relationship with their son). In James v. State Farm Mut. Auto. Ins. Co., 597 So.2d 555, (La.App. 1 Cir.1992), an award of $150,000.00 was granted to a mother who endured frequent long separations from her deceased daughter. Hill v. Morehouse Parish Police Jury, 26,772 (La. App. 2 Cir. 4/7/95), 653 So.2d 244, affirmed an award of $150,000.00 to a father who raised his son as a single parent, and had a close relationship with the deceased child. Bourne v. Seventh Ward General Hosp., 546 So.2d 197 (La.App. 1 Cir.1989) upheld an award of $150,000.00 for the loss of a 20-year-old son. See also Moreau v. State, Through Dept. of Transp. and Development, 527 So.2d 1221 (La.App. 3 Cir.1988) (an award of $150,000 00 was affirmed for the loss of an 18-year-old son); Hardy v. Cumis Ins. Co., 558 So.2d 625 (La.App. 1 Cir.1990) ($250,000.00 trial court award was reduced to $175,000.00 for the loss of a 22-year-old son); and Corbello v. Southern Pacific Transp. Co., 586 So.2d 1383 (La.App. 3 Cir.1991) ($250,000.00 award per parent was affirmed for loss of a daughter with whom her parents had a close relationship).
In the present case, it appears that Mr. Bean had a distant relationship with his daughter, saw her infrequently, and never lived with her. We find under these circumstances that an award of $1,000.00 will adequately compensate him for his loss.
Ms. Turner, however, eloquently expressed the extent of her loss in simple, effective words. She raised her daughter alone, without help from Mr. Bean. At the hospital, she was kept waiting for forty-five minutes to see her child, and then she viewed her daughter's body with water coming out of her nose and mouth. At the funeral, she wanted to turn and run. She feels that part of her is gone. Her daughter helped with her other children. Theirs was evidently a close and loving relationship.
We stated in St. Hill, supra:
In attempting to fix, in monetary terms, damages to parents for the death of a beloved child, we are acutely aware that no equation exists between the profoundness of the loss and the amount of any judgment. Such bereavement cannot translate into fiscal terms and each child is a pearl beyond price to its own parents. Yet it is our task to attempt, at least, to measure the immeasurable with finite tools and, in *78 cases such as this, the only means at our disposal is money.
We find those words equally applicable here. Considering all the facts and the pertinent law and jurisprudence, we find that an award of $225,000.00 to Ms. Turner is appropriate in the present case.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed in part, affirmed in part, amended in part, and rendered. Holidome, the Parish of Jefferson, and Krystal Turner were negligent in the premises herein, and such negligence proximately caused Krystal's death. This negligence is determined to be in the following proportions:

Holidome 60%
Parish of Jefferson 10%
Krystal Turner 15%
Ms. Eliza Turner 15%

Damages for Krystal's physical pain and suffering is fixed at $15,000.00, in favor of Ms. Turner, plus legal interest from the date of judicial demand. General damages are awarded to Mr. Bean in the amount of $1,000.00, plus legal interest, subject to a reduction of 15% as a result of the comparative negligence of Krystal. General damages are fixed in favor of Ms. Turner in the amount of $225,000.00, plus legal interest, with all damages in favor of Ms. Turner subject to reduction of 30% as a result of the combined comparative negligence of herself and Krystal. Appellees are assessed all costs of these proceedings.
JUDGMENT REVERSED IN PART, AFFIRMED IN PART, AMENDED AND RENDERED.
NOTES
[1] La.Code Civ.Pro. art. 1812(C) reads:

In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
La.Code Civ.Pro. art. 1813(C) reads:
When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.